## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BOSTON SWORD & TUNA, LLC and FORTUNE
INTERNATIONAL, LLC,

                    Plaintiffs,

  v.

CHRISTOPHER J. MARCHESE and VIKENCO NORTH
AMERICA, INC.,

                    Defendants.

:   Civil Action No. _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>VERIFIED COMPLAINT</u>

Plaintiffs Boston Sword & Tuna, LLC ("BST,") and Fortune International, LLC ("Fortune," and together with BST, the "Plaintiffs") submit this Verified Complaint against Defendants Christopher J. Marchese ("Marchese") and Vikenco North America, Inc. ("Vikenco," and together with Marchese, the "Defendants"), alleging as follows:

## I.    <u>NATURE OF THE ACTION</u>

1.    This action arises from Machese's serious and ongoing breaches of his contractual and common law obligations owing to Plaintiffs and Vikenco's complicity in these violations.

2.    As set forth below, Marchese, a former C-suite executive at BST, engaged in an ongoing scheme with Vikenco to misappropriate significant amounts of confidential and proprietary information and trade secrets from Plaintiffs—while Marchese was still employed by BST *and using Marchese's own BST e-mail address.* **They** used the stolen information to set up a competing business and to engage in direct competition with Plaintiffs and solicitation of Plaintiffs' clients, in direct violation of Marchese's common law and contractual obligations,

including without limitation his employment and post-employment restrictive covenants owing to Plaintiffs.

3.    Fortune and BST, leading providers of food procurement, production and distribution services, seek to enforce their express contractual and common law rights against Marchese, BST's former Chief Operating Officer and subsequently Director of Salmon and Key Accounts, and for relief against Vikenco, which has been complicit in and knowingly reaped the benefits of Marchese's malfeasance.

4.    Specifically, Plaintiffs recently discovered that while Marchese was employed by BST, he was simultaneously working with senior executives of Vikenco's Norwegian parent, Vikenco AS, to establish a U.S. entity (i.e., Vikenco) that would compete directly with Plaintiffs. Marchese did this notwithstanding his common law duties of loyalty that he owed to BST during his employment, as well as his contractual obligations not to compete with Plaintiffs.  Moreover, Vikenco was entirely complicit in this process.

5.    The forbidden competition is all the more egregious because, to accomplish it, Defendants expressly relied upon Plaintiffs' confidential and proprietary information, which Marchese brazenly e-mailed to Vikenco senior personnel using his BST e-mail account for a period of approximately six months prior to his resignation from BST.

6.    Marchese had served as a member of BST's senior leadership team, running its salmon division for more than 13 years—which consisted of overseeing the purchase, sale, packaging, processing, and distribution of more than 300,000 pounds of salmon per week.  He served as Chief Operating Officer from in or around 2019 until November 2024, when he moved into the role of Director of Key Accounts & Salmon. In these roles, Marchese routinely interacted with the Plaintiffs' key strategic customers and suppliers and was entrusted with highly

confidential and proprietary information and trade secrets including, but not limited to, sales strategies, sales volumes, customer information and order histories, pricing information, operational information and other information that cannot be disclosed to a direct competitor absent irreparable harm to Plaintiffs. Moreover, this information was not simply limited to Plaintiffs' salmon business—in his senior role, Marchese had access to customer and pricing information for other types of fish as well.

7.      Indeed, Marchese forwarded to senior Vikenco executives and/or his own personal e-mail address highly proprietary and sensitive confidential information and trade secrets belonging to Plaintiffs—this included everything from customer lists, customer purchase history, pricing information, logistics details and relationships, and even schematics for BST's facilities and details of BST's automated processing equipment.

8.      There was no legitimate business reason for him to forward such information to the Vikenco AS executives or his personal account and doing so was a direct violation of his Restrictive Covenants. This information would allow Vikenco's Norwegian parent to shortcut the process of building out a business that competes with Plaintiffs (i.e., Vikenco), while reaping the benefits of Plaintiffs' hard work and expense in developing its confidential and proprietary information and goodwill with its clients and customers. In short, the risk of confidential information being leaked is not hypothetical; it has already happened and, absent immediate court intervention, Plaintiffs will continue to be damaged by it.

9.      Making this all the more disconcerting, when Marchese resigned from BST, he promised BST that Vikenco would not compete with BST but rather would merely supplement its Norwegian parent's ability to service its existing U.S. clients such as BST. He affirmed that

Vikenco would not be soliciting business from BST clients or customers or competing with it in any way.

10.     This turned out to be a total falsehood: the impetus for this lawsuit is three very recent e-mails that a BST customer inadvertently sent to Marchese's old BST e-mail account, seeking to place purchase orders with Vikenco.  In other words, Vikenco and Marchese are engaged in direct competition with BST and are actively soliciting business from its clients, plainly in violation of Marchese's post-employment obligations and, presumably, utilizing the misappropriated information belonging to Plaintiffs.

11.     As a result, it is clear that Vikenco exists based on improper foundation—its business has been built up and generated through the misuse of Plaintiffs' confidential information and trade secrets, in violation of a host of post-employment restrictive covenants and common law obligations to which Defendants are subject.

12.     Accordingly, this Verified Complaint is submitted in connection with Plaintiffs' motion pursuant to Fed. R. Civ. P. 65 seeking an Order enjoining Defendants from breaching the express terms of the confidentiality, non-solicitation and non-competition provisions of the Transaction Bonus Agreement between Marchese and Fortune, dated May 5, 2023, (the "Transaction Bonus Agreement"); the Employee Restrictive Covenants Agreement between Marchese and BST, dated May 8, 2023 (the "Employee Restrictive Covenants Agreement"); the Amended and Restated Employment, Nondisclosure, and Noncompetition Agreement between the Marchese and BST, dated September 28, 2020 (the "Employment Agreement"); and the Confidentiality & Restrictive Covenants Agreement of the 2020 Profits Interest Plan and Award Agreements between Marchese and Dory Holdings LLC, dated May 8, 2023 (the "Confidentiality & Restrictive Covenants Agreement", and together with the aforementioned agreements, the

"Restrictive Covenants"). These Restrictive Covenants are narrowly tailored to protect BST's legitimate business interests in its confidential and proprietary information, trade secrets, and customer goodwill.

13.  Plaintiffs seek to compel Marchese to honor his contractual and common law commitments and obligations. Specifically, by way of injunctive relief, this Court should require Marchese to abide by his contractual obligations to BST and issue a temporary restraining order and preliminary injunction enjoining Marchese from breaching his post-employment obligations under the Restrictive Covenants. BST also seeks to enjoin Vikenco from employing Marchese in violation of his Restrictive Covenants and seeks actual and punitive damages for the tortious and wrongful conduct of Marchese and Vikenco. Plaintiffs further submit that Defendants must immediately be ordered to return to Plaintiffs any and all of their confidential and proprietary information that is in their possession, custody or control, including without limitation any and all copies, synopses and derivatives of such information.

14.  Without the requested injunctive relief, any award granted solely at law will be rendered meaningless because, as described herein, the grave likelihood of significant injury being inflicted upon Plaintiffs by Marchese and Vikenco will have become irreparable to Plaintiffs by the time an award is rendered in favor of the Plaintiffs.

## II.    <u>PARTIES</u>

15.  BST is a Massachusetts limited liability company with its principal office located at 10 Codfish Way, Boston, Massachusetts 02210.

16.  Fortune is an Illinois limited liability company with its principal office located at 1068 Thorndale, Bensenville, Illinois 60106.

17.  BST is a wholly owned subsidiary of Fortune.

18.     Marchese was formerly employed by BST, most recently as Director of Salmon and Key Accounts. Upon information and belief, Marchese resides at 66 Lake Street, Tewksbury, Massachusetts.

19.     Vikenco is a Delaware corporation with its principal office located at 4 Joanne Road, Burlington, Massachusetts 01803.

## III.     JURISDICTION AND VENUE

20.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiffs assert claims under the Defend Trade Secrets Act, 18 U.S.C § 1832, *et. seq.* and the Computer Fraud and Abuse Act, 18 U.S.C § 1030.  This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over Marchese under M.G.L. c. 223A, §§ 1, 2 and 3 because he transacted business and is domiciled in the Commonwealth of Massachusetts and because he expressly consented to the personal jurisdiction of the state and federal courts located in Suffolk County, Massachusetts, for any lawsuit filed there by BST arising from or relating to the Restrictive Covenants.

22.     This Court has personal jurisdiction over Vikenco under M.G.L. c. 223A, § 2 because its principal place of business is in the Commonwealth of Massachusetts.

23.     Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## IV.     FACTUAL BACKGROUND

### A.     Fortune and BST's Businesses

24.     Fortune and BST are engaged in a highly competitive business of purchasing, processing, and distributing a wide array of protein-based foods, including seafood, poultry, and beef, throughout the United States.

25.     Fortune was established in 2001 in the Chicago area and has expanded to become one of the country's largest importers, processors, and distributors of premium seafood, specialty meat, and gourmet food products. Today, Fortune owns and operates nearly 20 premium brands in seafood, meat, poultry, charcuterie, cheese, and many specialty categories.

26.     BST was established in 2003 and has become one of the largest seafood distributors in the United States. The company has continued to expand its product lines and the geographic markets it serves.

27.     Marchese was first hired by BST in or about June 2011.

28.     Marchese's position with BST was his first professional job and, thus, he did not bring any industry relationships or knowledge with him to BST.  All of his relationships is and information and expertise about the industry were developed during his employment at BST, through Plaintiffs' investment of time and money into Marchese.

29.     Marchese rose up through BST's ranks, becoming BST's COO in or about 2019 and serving in this role until November 2024.

30.     Following his tenure as COO, Marchese served at the Director of Salmon and Key Accounts until his resignation in December 2024.

31.     Marchese ran BST's salmon division for more than 13 years, which consisted of overseeing the purchase, sale, packaging, processing, and distribution of more than 300,000 pounds of salmon per week.

32.     In his roles as a member of BST's senior executive team, Marchese was introduced to and routinely interacted with the Plaintiffs' key strategic customers and suppliers and was entrusted with highly confidential and proprietary information and trade secrets including, but not limited to, sales strategies, sales volumes, customer information and order histories, pricing

information, operational information and other information that cannot be disclosed to a direct competitor absent irreparable harm to Plaintiffs.

33.    In May 2023, Fortune acquired BST.

34.    Together, Plaintiffs serve more than 15,000 customers throughout the country and handle more than 20,000 seafood and gourmet products each day.

35.    BST alone services more than 650 retail, wholesale, and distributor customers, and it is highly regarded for its focus on customer service, quality, premium product and custom specifications.

36.    Plaintiffs develop and maintain confidential and proprietary information that contributes to their market position and success in the industry.

37.    The confidential and proprietary information includes, among other things, client and prospective client information; client preferences; client and prospective client personal and financial information; contractual arrangements; business plans, strategies, tactics, policies, and procedures; marketing information, including sales or product plans, strategies, tactics, methods, packaging specifications, customer-trademarked product specifications, and market research data; financial information, including costs and performance data, pricing information, sales figures, and profit and loss figures; and operational information, such as the companies' strategies and techniques, hardware and software programs, codes and configurations, technical specifications and procedures, suppliers, materials, equipment, and research and development data (hereinafter "Confidential Information").

38.    Fortune and BST's Confidential Information has been compiled over time at great expense, and it provides Plaintiffs with a competitive advantage over other companies in their space.

39.     Fortune and BST rely on the Confidential Information to acquire, market, and sell its products.

40.     Plaintiffs spend substantial funds and dedicate extensive efforts to the development of innovations supporting their business, as well as to develop and establish critical supplier relationships, logistics arrangements, and import processing and handling arrangements.

41.     The Confidential Information and the developed goodwill gives Plaintiffs a distinct competitive advantage over others who do not have access to this information or these relationships, and any competitor would derive an unfair business advantage through the unauthorized use or disclosure of such Confidential Information or goodwill.

42.     Plaintiffs protect their Confidential Information in numerous ways to prevent its dissemination, both within the organizations and outside of them. This includes requiring high-level executives like Marchese to enter into restrictive covenants, including contractual obligations that they protect and not use or disclose any Confidential Information other than for BST's benefit.

43.     Plaintiffs also expend substantial resources in developing and cultivating relationships with customers, suppliers, logistics providers, and third-party cold-storage warehouses around the world and otherwise establishing goodwill and a reputation for high quality in the industry.

44.     To effectively compete in their industry, Plaintiffs rely on Confidential Information to create customized and competitive pricing for its customers. To protect their competitive advantage, the companies also maintain confidentiality as to the nature and breadth of the services and the pricing models they provide to each such customer .

45.     The identity of Plaintiffs' customers, the terms of their service agreements with Plaintiffs, and the pricing models applied for Plaintiffs' service offerings are a source of independent economic value to Plaintiffs.

46.     As a senior executive of BST, Marchese benefited directly from BST's competitive standing, reputation, and goodwill in the industry and with the specific customers it serves.

47.     Vikenco's access to Fortune and BST's Confidential Information described above is devastating to Plaintiffs' competitive advantage, as Vikenco can readily ascertain and easily target their customers and business strategies to unfairly interfere with and undercut their business, and in fact has already done so.

**B.      Marchese's Transaction Bonus Agreement with Fortune**

48.     As part of Fortune's acquisition of BST, on May 5, 2023, Marchese voluntarily entered into and executed the Transaction Bonus Agreement, which contains strict prohibitions against the disclosure of the companies' Confidential Information and restrictions against the solicitation of customers and employees during and after Marchese's employment with Fortune and BST. As consideration for entering into this agreement, Marchese received a $200,000 Transaction Bonus. A copy of the Transaction Bonus Agreement is attached hereto as Exhibit A.

49.     Marchese's Transaction Bonus Agreement with Fortune was designed to (i) protect Fortune's Confidential Information, customer relationships, goodwill in the industry, supplier relationships, and other vital business interests and trade secrets, and (ii) ensure that Fortune employees, particularly high-level and client-facing employees like Marchese, do not utilize or disclose Fortune's Confidential Information, business strategies and trade secrets or exploit Fortune's goodwill and customer and supplier relationships other than for BST's benefit..

50.     Under the Transaction Bonus Agreement, Marchese agreed to keep confidential and not disclose or use in any way, except as required in good faith to perform his employment duties for Fortune, any of BST's "Confidential Information" for the longest period permitted by applicable law.  *See* Ex. A § 5(e).

51.     The Transaction Bonus Agreement defines Confidential Information as follows:

> "<u>Confidential Information</u>" includes, but is not limited to, any non-public information that is used, developed, obtained or received by you or the Company Group in connection with the Company Group's business. Examples of Confidential Information include, but are not limited to: (i) client and prospective client and information, including client lists, compilations of client data, client preferences, and personal and/or financial information relating to clients; (ii) candidate and prospective candidate and information, including candidate lists, compilations of candidate data, candidate preferences, and personal and/or financial information relating to candidates; (iii) business information, including contractual arrangements, business plans, strategies, tactics, policies, procedures, resolutions, litigation or negotiations; (iv) marketing information, including sales or product plans, strategies, tactics, methods, or market research data; (v) financial information, including costs and performance data, pricing information, sales figures, profit or loss figures, debt arrangements, equity structure, investors and holdings; and (vi) operational information, such as the Company Group's strategies and techniques, hardware and software programs, codes and configurations, technical specifications and procedures, suppliers, materials, equipment, research and development data, testing data, and other similar records. If ordered by a court of competent jurisdiction to disclose Confidential Information, you will provide written notice to the Company Group of such order immediately and cooperate with it in seeking safeguards.

Ex. A, § 5(f)(ii). "Company Group," as defined in the Transaction Bonus Agreement, includes BST.

52.     Under the Transaction Bonus Agreement, Marchese also agreed not to, directly or indirectly, participate in the unauthorized use, disclosure or conversion of any Confidential Information. *See* Ex. A § 5(b). Specifically, he agreed:

> [N]ot to use Confidential Information for your sole benefit, or for the benefit of any person or entity in any way that harms the Company Group or diminishes the value of the Confidential Information to the Company Group. You also agree to use the specialized training, goodwill, and contacts developed with the Company Group's customers/clients and contractors for the exclusive benefit of the Company Group, and you agree not to use these items at any time in a way that would harm the business interests of the Company Group.

Ex. A, § 5(b).

53.    Under the Transaction Bonus Agreement, Marchese also agreed that he would not solicit Fortune's customers, suppliers and other business relations during his employment with Fortune and for two (2) years following his employment with BST. *See* Ex. A, § 5(c)(i). Specifically, he agreed that:

> [D]uring your employment and for two (2) years thereafter (the "Restricted Period"), you will not, directly or indirectly, for yourself or on behalf of or in connection with any other person, entity or organization, call on, solicit, have contact with, or service any customer, candidate, supplier or business relation of the Company Group with whom you did business or about whom you received or to whom you provided Confidential Information in order to (i) induce or attempt to induce such person or entity to cease doing business with, or reduce the amount of business conducted with, the Company Group, or (ii) in any way interfere with the relationship between any such person or entity and the Company Group.

Ex. A, § 5(c)(i).

54.    Notably, Marchese expressly consented to the issuance of an injunction and order of specific performance, without bond, to prevent and/or remedy an actual or threatened breach of the restrictive covenants in his Transaction Bonus Agreement. *See* Ex. A, § 8.  Specifically, he acknowledged as follows:

> You agree and acknowledge that if you violate this Agreement: the Company will suffer irreparable and continuing damage; that monetary damages would be insufficient to adequately compensate the Company for such damage; that the Company is entitled to injunctive relief, a decree for specific performance, and all other

> relief as may be proper (including monetary damages if
> appropriate), to the extent permitted by law; and that you shall not
> seek or require, and hereby waive, the need for the Company to post
> a bond.

Ex. A, § 8.

55.     Marchese voluntarily chose to accept continued employment with BST and the

$200,000 Transaction Bonus and agreed to the employment and post-employment restrictions in

the Transaction Bonus Agreement, which were a condition for his receipt of the Transaction

Bonus. Marchese was not in an unequal bargaining position, nor was he unaware of the full extent

of the restrictions or unable to reject the offer made to him.

**C.     Marchese's Employee Restrictive Covenants Agreement with BST**

56.     On May 8, 2023, Marchese voluntarily entered into and executed the Employee

Restrictive Covenants Agreement, which contains strict prohibitions against the disclosure of

BST's Confidential Information and restrictions against the solicitation of customers and

employees during and after Marchese's employment with BST. A copy of the Employee

Restrictive Covenants Agreement is attached hereto as Exhibit B.

57.     Marchese's Employee Restrictive Covenants Agreement with BST was designed

to (i) protect BST's Confidential Information, customer relationships, goodwill in the industry,

supplier relationships, and other vital business interests and trade secrets, and (ii) ensure that BST

employees, particularly high-level and client-facing employees like Marchese, do not utilize or

disclose BST's Confidential Information, business strategies and trade secrets or exploit BST

goodwill and customer and supplier relationships other than for BST's benefit.

58.     Under the Employee Restrictive Covenants Agreement, Marchese agreed to hold

BST's Confidential Information in the strictest confidence at all times during his employment with

BST and thereafter. *See* Ex. B, § III(B)(i).  Specifically, Marchese agreed that:

> The Employee acknowledges that Employee has been and will be entrusted with Confidential Information. The Employee shall at all times during the Employment Term and thereafter hold in strictest confidence any and all Confidential Information that may have come or may come into Employee's possession or within Employee's knowledge concerning the products, services, processes, methods, businesses, vendors, suppliers, customers, clients, employees, agents, consultants, independent contractors, landlords and strategic partners of the Company or its affiliates. The Employee agrees that neither Employee nor any Person controlled by Employee will for any reason directly or indirectly, for Employee's or for the benefit of any other Person, use, copy, divulge or otherwise disseminate or disclose any Confidential Information owned or used by, or licensed to, the Company or any of its affiliates or otherwise relating to the Company, its affiliates or the Business . . . The Employee shall take such protective measures as may be reasonably necessary to preserve the secrecy of, and interest of the Company in, the Confidential Information. If the Employee becomes aware of any unauthorized use or disclosure of Confidential Information by any Person, the Employee shall promptly and fully advise the Company of all facts known to the Employee concerning such unauthorized use or disclosure.

Ex. B, § III(B)(i).

59.     The Employee Restrictive Covenants Agreement defines Confidential Information as follows:

> "Confidential Information" means any information, in whatever form or medium, concerning the operations or affairs of the Company, its successors, assigns or any of their affiliates, whether developed prior to, on or after the Effective Date, including, but not limited to, (a) sales, sales volume, sales methods, sales proposals, business operations, business plans, including business development plans and strategies which have been implemented or are being considered, advertising and marketing plans, strategic and long-range plans, business records, and any information related to any of the foregoing, (b) pricing information and methods and general price lists, (c) Intellectual Property, (d) financial statements, budgets and projections, (e) personnel records and other information relating to employees, including any training materials, (f) the names, addresses and other contact information of all past, present or prospective vendors, suppliers, customers, clients, agents, consultants, independent contractors, landlords and strategic partners of the Company or any of its affiliates, and (g) all other confidential or proprietary information belonging to the Company,

any of its affiliates or otherwise relating to the Business, other than (1) knowledge, data and information that is generally known or becomes known in the trade or industry of the Company or any of its affiliates (other than as a result of a breach of this Agreement or other agreement or instrument to which the Employee is bound), and (2) knowledge, data and information gained without a breach of this Agreement on a non- confidential basis from a person who is not legally prohibited from transmitting the information to the Employee. For purposes of this definition, "Confidential Information" shall be deemed to include all confidential information learned while Employee was employed by any predecessor company of Fortune International, LLC.

Ex. B, § I.

60.    The Employee Restrictive Covenants Agreement defines Intellectual Property as follows:

"Intellectual Property" means, collectively, patents, patent disclosures, inventions, designs, models, processes, trademarks, trade names, service marks, trade dress, logos, copyrights and mask works (and all registrations, applications, reissuances, continuations, continuations-in-part, revisions, extensions, reexaminations and associated goodwill with respect to each of the foregoing), software (including source and object codes) owned or developed (or being developed), computer programs, computer data bases, written, magnetic and storage media and related documentation and materials, data, trade secrets, confidential business information (including ideas, formulas, compositions, inventions, know-how, production processes and techniques, research and development information, drawings, designs, plans, proposals and technical data, financial, marketing and business data and pricing and cost information), unexpired non-governmental accreditations, licenses and permits, franchises, licenses, distribution rights and the like and other proprietary rights used in or relating to the conduct of the Business (in whatever form or medium).

Ex. B, § I.

61.    Under the Employee Restrictive Covenants Agreement, Marchese also agreed that during his employment with BST and for one (1) year following the termination of his employment with BST for any reason, he would not, directly or indirectly, solicit, transact with, or receive any

economic benefit from BST's customers or solicit or induce any of BST's customers to end or modify their use of BST's products or services. *See* Ex. B, § III(D).  Specifically, Marchese agreed that:

> [A]t any time during the Restricted Period, the Employee shall not, directly or indirectly, whether for the Employee's account or for any other Person:
>
> i. solicit, attempt to solicit, transact with, attempt to transact with, or receive or attempt to receive any economic benefit from any customers of Company that Employee will build or has built relationships with on a regular basis, as a result of employment with Company for the purpose of engaging in activities directly or indirectly competitive with the business of the Company.
>
> ii. call upon or service any customer which the Employee will have any interactions or relationships with or had any interactions or relationships with, for the purpose of selling or attempting to sell to any such customer any products or services Employee is selling or will sell on behalf of Company.
>
> iii. solicit, induce or attempt to solicit or induce any then current customer of the Company to end or modify its use of the Company's products or services. Current customer shall mean any person or entity to which the Company has sold product to or has received payment from during the one-year period prior to the end of Employee's employment.

Ex. B, § III(D).

62.    Under the Employee Restrictive Covenants Agreement, Marchese also agreed that during his employment with BST and for one (1) year following the termination of his employment with BST for any reason, he would not interfere with BST's business relationships with its customers, vendors, suppliers, and other strategic partners. *See* Ex. B, § III(F). Specifically, Marchese agreed that:

> The Employee acknowledges that any Confidential Information of the Company and its affiliates are and will at all times be the sole and separate property of the Company and its affiliates, respectively, in which the Employee has no rights whatsoever, and all activities of or work performed by the Employee pursuant hereto or as an

> employee of the Company in the future will be performed for the benefit of the Company and the goodwill resulting from the Employee's efforts is and at all times will be the sole and separate property of the Company, which goodwill is intended to be protected, in part, by this Article III Section F. Employee agrees that, at all times during the Restricted Period, the Employee shall not, directly or indirectly, whether for the Employee's account or for any other Person, interfere with the relationship between the Company or any of its affiliates and any of their respective vendors, suppliers, customers, consultants, independent contractors, landlords or other strategic partners.

Ex. B, § III(F).

63.     Notably, Marchese expressly consented to the issuance of an injunction and order of specific performance to prevent and/or remedy an actual or threatened breach of the restrictive covenants in his Employee Restrictive Covenants Agreement. *See* Ex. B, § III(G).  Specifically, he acknowledged as follows:

> The Company and the Employee hereby agree that it is impossible to measure solely in money the damages that would be suffered by the Company by reason of the Employee's failure to observe any of Employee's obligations under this Agreement. Therefore, if the Company shall institute any action or proceeding to enforce such provisions, the Employee hereby waives the claim or defense that there is an adequate remedy at law and agrees in any such action or proceeding not to interpose the claim or defense that such remedy exists at law. Without limiting any other remedies that may be available to the Company, the Employee hereby specifically affirms the appropriateness of injunctive or other equitable relief in any such action, without the necessity of posting bond. The Employee also acknowledges that the remedies afforded the Company herein are not exclusive, nor shall they preclude the Company from seeking or receiving any other relief, including without limitation, any form of injunctive or equitable relief.

Ex. B, § III(G).

64.     Marchese additionally agreed that he was obligated to pay BST's attorneys' fees in connection with any action brought to enforce the terms of the Employee Restrictive Covenants Agreement:

> In any legal action taken by the Company to enforce this Agreement, and in which the Company prevails, in whole or in part, Employee agrees to pay the reasonable attorneys' fees incurred by the Company.

Ex. B, § IV(G).

65.     Marchese voluntarily chose to accept the benefits and consideration associated with the Employee Restrictive Covenants Agreement. Marchese was not in an unequal bargaining position, nor was he unaware of the full extent of the restrictions or unable to reject the offer made to him.

### D.    **Marchese's Employment Agreement with BST**

66.     In consideration for, *inter alia*, a guaranteed quarterly bonus of $3,750, an additional bonus premised on the sale of certain BST products and a guaranteed two-year term of employment (other than in the event of a termination for Cause), on September 28, 2020, Marchese voluntarily entered into and executed the Employment Agreement, which contains post-employment non-competition restrictions as well as restrictions against the solicitation of customers and employees and strict prohibitions against the disclosure of the Company's proprietary information. A copy of the Employment Agreement is attached hereto as Exhibit C.

67.     Marchese's Employment Agreement with BST was designed to (i) protect BST's proprietary information, customer relationships, goodwill in the industry, employee relationships, and other vital business interests and trade secrets, and (ii) ensure that BST employees, particularly high-level and client-facing employees like Marchese, do not utilize or disclose BST's proprietary information, business strategies and trade secrets or exploit BST's goodwill and customer relationships other than for BST's benefit.

68.     Under the Employment Agreement, Marchese agreed not to use in any way, directly or indirectly, or to disclose to any person, firm, corporation, or other entity, except for the benefit

of BST, any of BST's "Proprietary Information," as defined in the Employment Agreement  *See*

Ex. C, § 5.

      69.    The Employment Agreement defines Proprietary Information as follows:

(a) BST has developed or acquired materials and information (whether or not reduced to writing, patentable or protectable by copyright) relating to BST's operating procedures, products, methods, service techniques, manufacturing, "know-how," processes, trade secrets, company data regarding costs, profits, markets and sales, customer and supplier lists, plans for present and future research, development and marketing, and other proprietary information not available to the public (collectively "Proprietary Information") which gives it a special competence in its various fields of endeavor, all of which have been acquired at considerable expense to BST.

(b) The Employee recognizes that BST is engaged in a continuous program of development of such Proprietary Information. The Employee understands that as part of his or her employment, he or she is expected to make contributions of value to BST, including the development of Proprietary Information. He or she acknowledges that his or her employment creates a relationship of confidence and trust between himself or herself and BST with respect to information of a confidential nature that is discovered, made known to, or learned by him or her during the period of his or her employment, including Proprietary Information.

(c) The Employee will not, without the express authorization from the CEO or President of BST, during or after the term of his or her employment, disclose any Proprietary Information, or anything relating to it, to any person other than authorized BST personnel. Nor shall the Employee use any such information for his or her personal benefit or disclose or use for his or her personal benefit any information furnished by a third party to BST in confidence.

(d) The Employee agrees that upon the termination of his or her employment regardless of how or by whom terminated, he or she will deliver to BST and shall not take with him or her, all documents and materials of any nature pertaining to any Proprietary Information (also referred to as "Customer and Supplier Lists"). The Employee shall execute a certificate in the form of Appendix C at the time of termination of employment, confirming compliance with the requirements of this Section and

other provisions of this Agreement relating to the treatment of Proprietary Information.

Ex. C, § 5.

70.     Under the Employment Agreement, Marchese agreed to the following non-competition and non-solicitation restrictions:

> The Employee agrees that for a period of one year following the termination of his or her employment (the "Non-Competition Period") he or she will not directly or indirectly, for his or her own account or for any other person, as agent, employee, officer, director, trustee, consultant, owner, partner or shareholder, or in any other capacity:
>
> (i) hire or attempt to hire or assist any other person in hiring or attempting to hire any employee of BST; or
>
> (ii) encourage or assist any other person in encouraging any director, officer, employee, agent, consultant or any other person affiliated with BST to terminate or alter his or her or its relationship with BST; or
>
> (iii) encourage or assist any other person in encouraging any customer or supplier of BST to terminate or alter its relationship with BST; or
>
> (iv) sell or market or assist any other person in selling or marketing any product or service that competes, directly or indirectly with any product or service manufactured, sold or under development by BST at the time the Employee's employment with BST is terminated; or
>
> (v) research, develop or manufacture or assist any other person in researching, developing or manufacturing any product or service that competes with any product or service conceived, manufactured, sold or under development by BST at the time the Employee's employment with BST is terminated.

Ex. C, § 7(b).

71.     The Employment Agreement further provides that "The Non-Competition Period shall be extended to two (2) years upon Employee's breach of his/her fiduciary duty and/or

unlawful taking, physically or electronically, of property belonging to the Company."    Ex. C, § 7(c).

72.    Marchese acknowledged that because BST provides or offers its services throughout Massachusetts, a geographic restriction covering the Commonwealth of Massachusetts is reasonable. *See* Ex. C, § 7(d).

73.    The non-competition restriction is vital to ensure that senior-level executives like Marchese do not utilize or disclose the Company's Proprietary Information when working for a competitor and do not exploit the Company's business relationships.

74.    In addition, Marchese agreed to devote his entire time, undivided loyalty, and best efforts to BST's business. *See* Ex. C, § 3. Specifically, he acknowledged:

> The Employee agrees that he or she shall be a full-time employee, devoting his or her entire time, undivided loyalty and best efforts to the business of BST. The Employee shall not during the term of his or her employment be engaged in any other occupation, professional or business activity. As a representative of BST, the Employee further agrees to always conduct himself or herself in accordance with the highest ethical and moral standards during both working and nonworking hours. Attached to this Agreement as Appendix A is BST's "Conflicts of Interest Policy." By executing this Agreement, the Employee represents and warrants that he or she has reviewed carefully this Agreement, the Policy and is familiar with and agrees to abide by the Agreement, the Policy and the BST Employee Handbook, as they may be updated and modified by BST from time to time.

Ex. C, § 3.

75.    Notably, Marchese expressly consented to the issuance of an injunction and order of specific performance to prevent and/or remedy an actual or threatened breach of the restrictive covenants in his Employment Agreement. *See* Ex. C, § 9.    Specifically, he acknowledged as follows:

> In order to avoid irreparable injury to BST, in the event of any breach or threatened breach by the Employee of the provisions of

this Agreement, BST shall be entitled to an injunction restraining such breach. Nothing herein shall be construed as prohibiting BST from pursuing any other remedies available to BST for such breach or threatened breach, including the recovery of damages from the Employee. The Employee agrees that in the event that he or she breaches his or her duty of loyalty to Company or any of his or her covenants in Sections 5 through 7, in addition to any and all other remedies BST may have available to it, BST will be entitled, at its election, to recover from the Employee (i) the value of anything belonging to BST the Employee uses in breach of such duty or (ii) any benefit the Employee receives as a result of his or her breach or its proceeds and (iii) its reasonable attorney fees incurred in enforcing this Agreement, and BST shall also be entitled to recover from the Employee the amount of damages thereby caused. In the event of termination of the Employee's employment for breach of any of the covenants under this Employment Agreement, Employee agrees that he or she shall thereby forfeit all rights granted to him or her under any stock option, profit participation, bonus or deferred compensation arrangement of BST then existing in which he or she participates, to the extent permitted by law.

Ex. C, § 9.

76.     Marchese further agreed that in the event that he were to breach his "duty of loyalty to the Company" or any of the aforementioned covenants, BST would be entitled to recover, in addition to injunctive relief, BST's "reasonable attorney fees incurred in enforcing this Agreement," as well as any other damages incurred. *See* Ex. C, § 9.

77.     Marchese voluntarily chose to receive the material consideration provided for under the Employment Agreement, including the guaranteed quarterly bonus, the supplemental sales bonus and the guaranteed two-year term of employment.  Marchese was not in an unequal bargaining position, nor was he unaware of the full extent of the restrictions or unable to reject the offer made to him.

78.     As COO, Marchese was highly compensated as a senior executive for BST.

79.     Marchese made an informed decision to accept BST's offer of continued employment and to continue working for BST for approximately four years. He committed to honor his post-employment obligations to BST.

E.     **The 2020 Profits Interest Plan and Award Agreements
       Contain Additional Post-Employment Restrictions**

80.     Due to his senior role at BST, Dory Holdings LLC, BST and Fortune's parent company, granted Marchese a certain number of profits interests, subject to vesting and multiple on invested capital, pursuant to the terms and conditions of its 2020 Profits Interest Plan and Award Agreements (the "Profits Interest Plan"), and thereby became a partner in Dory Holdings LLC, including without limitation receiving a K-1 with respect to same.

81.     In exchange for this valuable consideration, Marchese agreed, in the Profits Interest Plan's Confidentiality & Restrictive Covenants Agreement, to refrain from engaging in competitive activity during his employment and for one (1) year after the termination of his employment, to refrain from soliciting customers or employees and to refrain from using or disclosing the Company's Confidential Information.  *See* Ex. D, §§ 3, 4. A copy of the Confidentiality & Restrictive Covenants Agreement is attached hereto as Exhibit D.

82.     Under the Confidentiality & Restrictive Covenants Agreement, Marchese acknowledged and agreed that Fortune, BST and Dory are "engaged in a highly competitive industry and would suffer irreparable harm and incur substantial damage" if Marchese were to join a competitor. *See* Ex. D, § 3.

83.     Specifically, Marchese agreed to the following:

> In exchange for and ancillary to the promises set forth in this Agreement, Participant agrees that, during Participant's employment with any member of the Company Group and for a period of twelve (12) months after Participant ceases to be employed by a member of the Company Group, Participant shall not, directly or indirectly, whether as a principal, director, employee, agent, distributor, representative, stockholder or otherwise, participate in any position or role with a Competing Business (as the term is defined below) in the Restricted Area (as the term is defined below) that would involve Participant providing services, or Participant supervising services, that are similar in function or purpose to those Participant

performed on behalf of the Company Group in the Look Back Period
(as the term is defined below).

    i.    "Competing Business" means any person or entity engaged
in, or planning to engage in, the business of providing
Competitive Services in the Restricted Area.

    ii.    "Competitive Services" means service offerings or products
that compete with, or are similar in function or purpose to
service offerings and products of the Company Group during
the term of Participant's employment and as of the
termination of Participant's employment. The foregoing will
not apply to service offerings or products that the Company
Group is no longer in the business of providing at the
relevant time of enforcement.

    iii.    "Look Back Period" means the last two (2) years of
Participant's employment with a member of the Company
Group or such shorter time as Participant has been
employed.

    iv.    "Restricted Area" means the geographic areas in which
Participant, during any time within Look Back Period,
provided services or had a material presence or influence.

Ex. D, § 3(a).

84.    Under the Confidentiality & Restrictive Covenants Agreement, Marchese also

agreed that during his employment and for one (1) year following his employment, he would not

directly or indirectly, solicit BST's customers to cease doing business with BST or arrange

business deals outside of the scope of his employment with BST with BST's customers. *See* Ex.

D, § 3(b).

85.    Specifically, he agreed that:

In exchange for and ancillary to the promises set forth in this
Agreement, Participant agrees that, during Participant's employment
with any member of the Company Group and for a period of twelve
(12) months after Participant ceases to be employed by a member of
the Company Group for any reason, Participant will not, directly or
indirectly, for Participant or on behalf of, or in conjunction with, any
other person, persons, company, partnership, corporation or
business entity, solicit any Covered Customer to cease doing

24

business with the Company Group, or transact business related to any Competitive Services from any Covered Customer. "Covered Customer" means any person or entity that does business with a member of the Company Group and that Participant had business-related contact with or had access to Confidential Information about during the Look Back Period (defined above). The term "Covered Customer" will not include (a) a person or entity that has completely ceased doing business with the Company Group at the relevant date of enforcement for reasons entirely unrelated to Participant and due to no fault of Participant or violation of this Agreement by Participant, or (b) a person or entity that Participant has had no contact with and received no Confidential Information about during the Look Back Period.

Ex. D, § 3(b).

86.     Marchese also agreed to use BST's Confidential Information only in the performance of his job duties for BST, and not for his personal benefit, for the benefit of another person or entity, or in any manner adverse to the interests of BST and Fortune. He also agreed that he would not remove, copy, download, or transmit any of Fortune and BST's information except for the benefit of those companies. *See* Ex. D, § 4(a).

87.     Specifically, Marchese agreed and acknowledged:

Participant acknowledges and agrees that each and every part of the Company Group's Confidential Information: (a) has been developed by the Company Group at significant effort and expense; (b) is sufficiently secret to derive economic value from not being generally known to other parties; (c) is proprietary to and a trade secret of the Company Group and, as such, is a valuable, special, and unique asset of the Company Group; and (d) constitutes a protectable business interest of the Company Group. Participant further acknowledges and agrees that any unauthorized use or disclosure of any Confidential Information by Participant will cause irreparable harm and loss to the Company Group. Participant acknowledges and agrees that Participant does not own the Confidential Information. Participant agrees not to dispute, contest, or deny any such ownership rights either during or after Participant's employment with any member of the Company Group. In recognition of the foregoing, Participant covenants and agrees as follows:

i.      Participant will use Confidential Information only in the performance of Participant's duties for and obligations to the Company Group. Participant will not use Confidential Information, directly or indirectly, at any time during or after Participant's employment with any member of the Company Group, for Participant's personal benefit, for the benefit of any other person or entity, or in any manner adverse to the interests of the Company Group. Further, Participant will keep secret all Confidential Information and will not make use of, divulge, or otherwise disclose Confidential Information, directly or indirectly, to anyone outside of the Company Group, except as otherwise provided in this Agreement or with the Company's prior written consent;

ii.     Participant will take all necessary and reasonable steps to ensure that Participant does not, by act or omission, disclose Confidential Information to anyone outside of the Company Group, except with the Company's prior written consent;

iii.    Participant shall not at any time remove, copy, download, or transmit any information from the Company Group during Participant's employment with any member of the Company Group and for a period of twelve (12) months thereafter, except for the benefit of the Company Group and in accordance with this Agreement and the Company Group's policies; and

iv.     Promptly upon the termination of Participant's employment with any member of the Company Group, or at any other time requested by the Company, Participant shall return to the Company Group any and all Company Group property and Confidential Information in Participant's possession, custody, or control, whether in electronic or hard copy form, which Participant obtained while employed by the Company or otherwise serving or acting on behalf of the Company, or which Participant may then possess or have under Participant's control.

Ex. D, § 4(a).

88.    Under the Confidentiality & Restrictive Covenants Agreement, Confidential Information is defined as:

During Participant's employment with any member of the Company Group, and by the nature of Participant's duties and obligations in connection therewith, the Company agrees to provide, and will

provide, Participant with confidential information of the Company Group and the Company's Affiliates, including: trade secrets, know-how, inventions, business plans, client/customer lists, pricing, sales and marketing information, products, research, algorithms, market intelligence, services, technologies, methods of doing business, patterns, processes, compounds, formulae, programs, compilations of information, development, purchasing, computer programs (whether in source code or object code), techniques, procedures, strategies, systems, designs, works of art, the identity of and any information concerning customers, or potential customers, information received from others that the Company Group is obligated to treat as confidential or proprietary, and any other technical, operating, non-public financial, and other non-public and proprietary business information that has commercial value, in each case relating to the Company Group, its business, potential business, or operations (collectively, "Confidential Information").

Ex. D, § 4(a).

89.    In the Confidentiality & Restrictive Covenants Agreement, Marchese expressly acknowledged that:

Participant agrees that it would be difficult to measure any damages caused to the Company which might result from any breach by Participant of the covenants and agreements set forth in Sections 3 and 4, and that in any event money damages would be an inadequate remedy for any such breach. Accordingly, and notwithstanding any other provision of this Agreement, Participant agrees that if Participant breaches, or the Company reasonably believes that Participant is likely to breach, Sections 3 and/or 4, the Company shall be entitled, in addition to all other remedies that it may have, to an injunction or other appropriate equitable relief to restrain any such breach, without showing or proving any actual damage to the Company. Participant agrees that in the event that the Company seeks injunctive relief based on this Agreement, bond in the amount of $1,000.00 shall be adequate security for such relief. Nothing contained in this Section 5 or in any other provision of the Agreement shall restrict or limit in any manner the Company's right to seek and obtain any form of relief, legal or equitable, and shall not waive the Company's right to any other relief related to any dispute arising out of this Agreement or related to Participant's employment with any member of the Company Group.

Ex. D, § 5.

90.     Marchese additionally agreed that Plaintiffs were entitled to recover their attorneys' fees in the event that he breached his post-employment obligations:

> In the event that any member of the Company Group initiates legal or equitable proceedings to enforce a provision of Sections 3 or 4 of this Agreement, the Company Group will be entitled to an award of its reasonable attorneys' fees and costs incurred if it prevails on all or part of the claims made in the proceeding.

Ex. D, § 7.

91.     Finally, Marchese expressly agreed that he had an affirmative obligation to share any and all post-employment obligations (such as the Restrictive Covenants discussed above) with any future employer that employed him within one year of the end of his employment with Fortune and BST. *See* Ex. D, § 9.

92.     Marchese voluntarily chose to receive the benefits exchanged in consideration for the Confidentiality & Restrictive Covenants Agreement, including without limitation his eligibility to participate in the Profits Units Interest Plan.  Marchese was not in an unequal bargaining position, nor was he unaware of the full extent of the restrictions or unable to reject the offer made to him. *See* Ex. D, § 20.

**F.**     **Marchese's Employment with Fortune and BST**

93.     In or around 2011, Marchese commenced his employment with BST as Salmon Production Manager.

94.     Marchese was promoted to Operations Manager in or around 2015.

95.     Marchese became Chief Operating Officer in or around 2019 and served in this role until November 2024.

96.     Marchese moved to Director of Salmon and Key Accounts in November 2024.

97.     Fortune and BST invested considerable resources into training and promoting Marchese, making him a "public face" of BST's salmon products as he worked directly with many

of Fortune and BST's most important seafood customers, suppliers, and logistics and cold-storage providers.

98.    Throughout his employment with BST, the company's salmon division grew from managing several thousands of pounds of salmon each week to nearly 300,000 pounds per week, and Marchese's industry relationships and stature grew alongside BST's salmon division.

99.    All of Marchese's business relationships, including with Vikenco's executives and BST's customers and clients, were based on introductions made to him by other BST executives. Marchese brought zero business relationships with him to BST.

100.    Marchese was a member of BST's senior leadership team, working alongside BST's Chief Executive Officer, its President, and other senior leaders at BST's Boston office, through which he regularly was privy to significant Confidential Information.

101.    Marchese was highly paid—in 2024 he earned more than $330,000 and in 2023 he earned nearly $550,000. Part of his compensation included a special arrangement with Fortune and BST under which he received $0.10 for every seafood burger he sold. He additionally was a partner in Dory Holdings LLC, Plaintiffs' ultimate parent.

102.    Marchese was one of a small number of BST executives to receive a Transaction Bonus in connection with BST's acquisition by Fortune, and he and Fortune agreed that he was, "and will continue to be, in a position of special trust and confidence" at Fortune and BST. Ex. A, §5(a).

103.    In this "position of special trust and confidence," Marchese had access to BST's most sensitive Confidential Information, including, but not limited to, the salmon division's monthly revenue figures; customer names, locations, preferences, arrangements, and sales volume,

both for the salmon division and other divisions; supplier names, pricing, and product lists; and BST's warehouse and equipment configurations.

104.    In the course of his employment with Fortune and BST, Marchese regularly used and contributed to the development of Fortune and BST's Confidential Information.

105.    For instance, Marchese actively bought and sold salmon products on BST's behalf, negotiating pricing with suppliers and customers. Such pricing information is confidential and highly sensitive because of the competitive nature of the market. BST's customers regularly purchase products from an array of competing distributors, making specific purchases based on price and quality, among other factors. A competitor having access to BST's pricing would enable the competitor to undercut BST's pricing, harming BST's business while receiving the benefit of BST's investment of time and money in developing its pricing models.

106.    Marchese was also involved in setting up BST's trucking and distribution operations for its salmon products. These distribution plans are Fortune and BST's Intellectual Property and are highly confidential and sensitive.

107.    A competitor having access to this information would be able to use the knowledge and insights that BST built over many years to get a jump-start on determining how to operate its business without putting in the hard work that BST did and undermine BST's competitive advantage in the marketplace.

### G.    Marchese & Vikenco Misappropriate Plaintiffs' Confidential & Proprietary Information and Trade Secrets, While Setting Up a Competing Business

108.    Vikenco was incorporated in or about November 2024.

109.    Vikenco's parent company, Vikenco AS, is based in Norway. Vikenco AS is a large salmon producer and majority owned by SalMar ASA.

110.    Vikenco AS has been a supplier to BST for approximately 15 years.

111.    Certain executives of Vikenco AS are identified as directors of Vikenco on Vikenco's corporate filings, including Per Olav Mevold ("Mevold") and Jonny Småge ("Småge"). Mevold is additionally identified as President of Vikenco, while Småge is also Treasurer and Secretary.  Mevold is also the General Manager and Chief Executive Officer of Vikenco AS, while Småge is its Vice President and Chief Operating Officer.

112.    Until late 2024, Vikenco AS had no physical presence in the United States—it relied on American distributors like BST to distribute its products to U.S. grocery stores, wholesalers and other third parties.

113.    However, with the creation of Vikenco in November 2024, Vikenco AS established a presence in the United States and, as Plaintiffs recently came to learn, has been actively competing with Plaintiffs for the same customers and same business provided by BST.

114.    Unfortunately, rather than put in the necessary time and monetary investment to independently establish its U.S. business, Vikenco AS decided to take a shortcut by entering into a scheme with Marchese by which, over a period of approximately six (6) months, Marchese—while still employed by BST—funneled BST's Confidential Information to Småge and Mevold, allowing Vikenco to enter the market more expediently and at a fraction of the cost.

115.    Moreover, after Marchese left BST in December 2024, he promptly joined Vikenco as its CEO, with a 15% ownership interest in that company. He did so under the false representation to BST that Vikenco would not be engaging in competition with BST, but rather would only be augmenting Vikenco AS's business by supporting its product sales to BST and similar wholesalers, consistent with its existing business model.

116.    This turned out to be a complete fabrication; instead, Marchese has been surreptitiously competing with Plaintiffs (in violation of his post-employment non-competition

covenants) and soliciting BST's customers and clients (in violation of his post-employment non-solicitation covenants) while relying on BST's Confidential Information to do so.

117.    Nor is this some hypothetical situation: Marchese and Vikenco have been caught red-handed as, through a recent investigation, Plaintiffs discovered numerous e-mails sent ***from Marchese's BST e-mail address*** to Vikenco, passing along critical Confidential Information to Vikenco, including Mevold and Småge.

118.    By way of background, like his other relationships in the salmon industry, Marchese met Mevold and Småge, as well as other Vikenco AS employees, in the course of his employment with BST through introductions made by other BST executives.

119.    As BST's salmon division grew, Marchese grew close with Vikenco's AS's executives and steered a significant volume of Fortune and BST business to Vikenco AS.

120.    Upon information and belief, Marchese began discussing a job opportunity with Vikenco by no later than June 2024.

121.    For instance, e-mail traffic sent over BST's e-mail servers at or about this time reflects Marchese requesting employment-related documentation from Plaintiffs, including specifically his post-employment restrictive covenants, as well as an engagement letter with an attorney engaged specifically to review the applicability of Marchese's post-employment restrictive covenants with respect to employment by Vikenco.

122.    At or about this same time, Marchese began sending Plaintiffs' Confidential Information—using his BST e-mail account—to Mevold and Småge, and continued to do until the end of his employment in December 2024.  If Marchese was willing to so brazenly send information over his BST e-mail account, Plaintiffs anticipate that his own personal e-mail accounts, text messages and other communications with Vikenco, Mevold and Småge will contain

troves of additional Confidential Information, revealing further instances of malfeasance by Marchese.

123.    For instance, on June 25, 2024, Marchese provided Vikenco with a customer list of BST's salmon buyers. Specifically, Marchese sent Småge an untitled e-mail; the body of this e-mail contained a list of each of the third parties to whom BST sold salmon and identified critical information about the volume of their salmon purchases year to date (through June 24, 2024).

124.    Moreover, for many of the larger customers, this list broke down the sales volume by region, which would allow Vikenco not only to target specific customers, but would allow Vikenco to tailor its attack on BST's customers and their needs.

125.    Vikenco could use (and appears to have used) this information to target BST's customers and undercut BST's pricing, which could result in a loss of business for, and irreparable harm to, Plaintiffs.

126.    Similarly, on June 24, 2024, Marchese sent Småge an e-mail, titled "Frozen YTD". This e-mail included confidential internal information regarding the sales figures for frozen salmon sold by BST year-to-date (through June 22, 2024). This e-mail also identified the size of the salmon filet being sold, as well as the total volume in weight of frozen salmon sold by BST.

127.    On another occasion, on July 4, 2024, Marchese forwarded an e-mail, subject line "Fwd: [Customer 1's] Farmed Salmon Program – Cost Update," to Mevold and Småge. The e-mail is from one of BST's largest and most important customers (referred to herein as "Customer 1") and, as a result of the goodwill developed through the relationship between Customer 1 and BST, it frequently shares non-public information about its customer needs and preferences in these e-mails.

128.    In this July 4 e-mail, Customer 1 provided information regarding specific customer needs, including a request for a specific new type of cut of salmon that it was seeking from BST and other related product specifications.

129.    In addition, this e-mail contained the contact information for Customer 1's salmon buyer, information which would be incredibly valuable to a competitor such as Vikenco seeking to sell salmon directly to Customer 1.

130.    On August 12, 2024, Marchese forwarded to Småge and Mevold the subsequent e-mail chain to the aforementioned "Fwd: [Customer 1] Farmed Salmon Program – Cost Update" e-mail. This e-mail chain included the back and forth negotiation over the new cut of salmon that Customer 1 was seeking, including the parties' respective bids and offers on pricing, detailed information regarding other non-monetary negotiating points, information about Customer 1's preferences (e.g., regarding farmed v. wild salmon), and various other non-public information regarding Customer 1's needs as a customer.

131.    In addition, this e-mail attached an Excel sheet, "BST Seafood Formula Costing.xlsx", which provided detailed information regarding how BST had reached the proposed costs that it had provided to Customer 1.  This spreadsheet include information regarding labor costs, packaging costs, the estimated amount of fish that would be yielded from a specific cut (referred to as a "trim") of the salmon, the value of a "trim credit" (from the sale of any trimmed amounts that could otherwise be sold by BST), and delivery costs to various Customer 1 regions serviced by BST.

132.    Suffice it to say, this e-mail and the attached document provided a veritable blueprint for a third party such as Vikenco to seek out Customer 1 business while undercutting Plaintiffs.

133.    More to the point, this represented a coordinated effort by Marchese and Vikenco to attack BST's largest clients and customers, as they targeted and misappropriated information relating to Customer 1, along with Customers 2 through 4 (discussed below), among other clients, which represented a veritable who's who of BST's most significant clients and customers.

134.    Combined, these customers represent well in excess of $150 million in sales in 2024 alone.

135.    On July 5, 2024, in an e-mail entitled "Sales Snapshor [*sic*] Detail," Marchese sent Småge an e-mail that merely attached two .pdf documents.  As stated in Marchese's cover e-mail to Småge, this was BST's "all Skin Pack Product.  Last year + this year."

136.    The .pdfs included detailed information regarding BST's sales to its Customer 4 for 2023 and 2024.  The documents identified, among other things, the specific products purchased by Customer 4 in each year, breaking the products down by type of seafood, cut size, and various other information.

137.    In addition, the .pdfs included information regarding the total weight of the product sold to Customer 4, the price that was charged to Customer 4, the cost to BST for the products, the mark-up that BST applies to these products, and its sales margin on the products.

138.    BST has developed its facilities over many years and at great expense, as it has invested millions of dollars into developing an efficient production system that allows it to process, fillet, debone, package, freeze and otherwise prepare its seafood for sale to third parties.  As such, information regarding BST's processing systems is Confidential and Proprietary Information, and the provision of such information to a third party would allow that third party to reap a significant benefit, without the cost of BST's investment.

139.    On August 5, 2024, Marchese forwarded detailed information regarding BST's warehouse design and processing systems to his personal e-mail address.  For instance, in an e-mail "FW: Marel CAD," Marchese forwarded an e-mail chain with third-party Marel, which is a food processing company.

140.    The e-mail attached a CAD drawing of a conveyor and production line that BST had commissioned from third-party Marel.  Notably, the e-mail that Marchese forwarded to his personal address was from February 2023, more than a year earlier; in other words, there was no reason he would need to be accessing this information at this time, other than if he was attempting to set up a competing business with Vikenco.

141.    On that same date, in another e-mail, "FW: Pinbone line," Marchese forwarded another e-mail between BST, Marel and a third-party designer to his personal address.  This e-mail attached, *inter alia*, a .pdf titled "20807 BST – Change Bulletin 09_Equipment Layout Update (DWG's).pdf", which .pdf contained a detailed blueprint of BST's warehouse operations, including the specific placement of its equipment and productions lines, which BST has designed over time to promote efficiency and expediency, and which information would be of incredible value to a competitor.

142.    Also on that date, Marchese forwarded to his personal e-mail address a document titled "Boston Sward [*sic*] & Tuna Addition Racking 10-31-22."  This document provided detailed schematics, prepared by a third party at expense to BST, regarding certain potential changes to BST's production line designed to increase their efficiency.

143.    Similarly, in two e-mails to Småge on July 5, 2024, Marchese forwarded information regarding processing equipment utilized by BST in processing fish, sending Småge

links to different equipment that BST uses and noting, with respect to one, "We [BST] have 3 of these."

144.    The information in the three August 5, 2024 e-mails and the July 5 e-mails constitutes a trade secret of Plaintiffs and Confidential and Proprietary Information under Marchese's Restrictive Covenants, which information Vikenco could use to build out its own warehouse and processing capabilities, shortcutting the processes that BST has developed over many years and at the cost of millions of dollars to it.

145.    Marchese, Småge and Mevold also incredibly exchanged e-mails over BST's e-mail systems which plainly reflect their intent to start competing with BST, including Vikenco directly soliciting information from Marchese regarding where BST conducted business.

146.    On September 21, 2024, in an e-mail titled "Cleveland, Ohio," Mevold e-mailed Marchese, cc'ing Småge, asking "Do you [BST] have any of our Salmon in any retail in the area of Cleveland Ohio?  I'll explain Wednesday why we ask.  😊 "

147.    Marchese responded by providing information regarding which BST clients operate in that area and what type of salmon BST sells to those clients, as well as his understanding of to whom those clients in turn sell. s He also provided a list of "the main seafood wholesalers in Ohio."

148.    Providing Vikenco with a list of "the main seafood wholesalers in Ohio" is plainly acting contrary to BST's interests, as it serves no business purpose for BST, but would allow Vikenco to circumvent BST by selling products directly to those wholesalers.

149.    Marchese continued to misappropriate Confidential and Proprietary Information throughout the balance of his employment with BST.  For instance, on October 10, 2024, Marchese forwarded an e-mail titled "Fw: Breakdown of charges request – Everett" to his personal e-mail address, attaching a .pdf file named "BOSSWO SALE REPORT."  The preceding e-mail chain

appears to reflect that this information had been requested specifically by Marchese from others at BST and had been received by him just the day before he sent it to himself

150.    The attached .pdf provided a detailed breakdown of logistics costs incurred by BST with respect to one of its logistics providers over the preceding 12-month period. This included charges relating to storage costs, handling and loading costs, pallet charges, and other similar costs.

151.    This coincided with Marchese forwarding to himself, on October 8, 2024, two e-mails – titled "Miami3 Charges" and "Miami4 Charges" – which provided an accounting of freezer storage costs incurred by BST with respect to its South Florida operations.  Notably, Marchese specifically requested this information from another BST employee, but appears to have done nothing with it other than to e-mail it to his personal e-mail account within, respectively, two and one minutes of receipt.

152.    In addition, on this same date, Marchese requested, in an e-mail titled "FW: today's task," that a BST employee provide him with charges from another third-party logistics vendor in the Miami area; in response, Marchese received an e-mail with a breakdown of specific costs charged to BST by that vendor and, within an hour of receipt, forwarded this to his personal e-mail address.

153.    In short, through these four e-mails, it was clear that Marchese was misappropriating Confidential and Proprietary Information regarding BST's operations and logistics which would be incredibly valuable to a competitor seeking to set up a business in the South Florida region, since it would provide a blueprint of the costs and logistics needed to create an operation in that area, as well as allowing that competitor to undercut BST's logistics costs in that region.

154.    Consistent with efforts to set up a competing business, on November 29, 2024, Marchese received an e-mail from an individual named Kandy Robson ("Robson"), entitled "Industrial Sublease Opportunity | 65 Sunnyslope Ave, Tewksbury, MA."  This e-mail purports to provide information about a potential opportunity to lease a facility. Robson was the former Office Manager for BST who had resigned in or about late 2023. Robson was a long-time BST employee who received a Transaction Bonus in 2023 and is subject to the same restricted covenants under the Transaction Bonus Agreement as Marchese.

155.    Marchese in turn forwarded this e-mail to his personal e-mail address.

156.    Notably, Robson appears to be a Vikenco employee, as a subsequent meeting invitation (described below) identifies Robson as having a Vikenco e-mail address.

157.    Upon information and belief, Marchese further met with Vikenco personnel about Vikenco's business during the course of his employment with BST.  For instance, on December 17, 2024, while still employed by BST, Marchese received an Outlook meeting invitation.  The meeting was titled "Status Update VNA" – i.e., Vikenco North America.  This invitation included Småge, Robson and three other employees of Vikenco AS.

158.    For the avoidance of doubt, the information described above that Marchese and Vikenco misappropriated constitutes Confidential and Proprietary Information and trade secrets belonging to Plaintiffs, which was developed over time and at great expense of Plaintiffs, the disclosure and misuse of which would give Vikenco and Marchese an improper competitive advantage while causing irreparable harm to Plaintiffs.

**H.    Marchese's Disloyal Conduct During His Employment Harms Plaintiffs for the Benefit of Vikenco**

159.    In addition to working directly with Vikenco to set up a competing business, upon information and belief, Marchese actively worked to undermine Plaintiffs' business during the final six or so months of his employment with BST.

160.    The purpose of this appears to have been twofold: first, to lock BST into supply contracts with Vikenco AS that were favorable to Vikenco AS, and thus would be beneficial to Marchese's new employer Vikenco, and, second, to undermine BST's relationships with other customers and vendors, such that those third parties would be likely to do business with Vikenco as opposed to BST.

161.    By way of example, internal e-mails and communications reflect that Marchese routinely promoted Vikenco AS as a supplier to BST over other potential suppliers; upon information and belief, including based on an investigation into Marchese's BST e-mail account, it appears that to do so, Marchese simply fabricated from whole cloth pricing figures from other suppliers to create the veneer that Vikenco AS would provide BST more favorable pricing.

162.    Specifically, Marchese e-mailed other BST executives purporting to report pricing from five different Norwegian salmon sellers, but upon further review, the e-mail appears to only show Vikenco's actual pricing—the other four sellers' pricing appear to be made up.

163.    In other words, Marchese was trying to obtain business for Vikenco AS through deceptive means to the detriment of his then-employer BST.

164.    In addition, it appears that Marchese provided customers of BST with above-market prices for salmon so that he could later step in and offer a lower price from Vikenco.  For instance, in one October 2024 e-mail, Marchese offered salmon at an above-market price to Customer 2, while at the same time discouraging Customer 2 executives from purchasing certain BST products.

165.    Perhaps unsurprisingly, as detailed further below, it has become clear that since leaving BST, Marchese has solicited business from Customer 2 on behalf of Vikenco.

166.    Upon information and belief, Marchese withheld from other BST executives business opportunities presented to him in his capacity as BST's salmon buyer by other Norwegian salmon sellers that competed with Vikenco AS.

167.    For instance, on August 21, 2024, Marchese forwarded an e-mail chain with pricing information and specifications from a potential salmon supplier to Småge. In the e-mail chain, the supplier had reached out to Marchese, seeking to solicit business from BST.

168.    Upon information and belief, Marchese did not make any effort to seriously engage with or vet this potential supplier, which could have provided more beneficial pricing to BST than other suppliers. Instead, Marchese forwarded the e-mail chain to Småge, asking "know these fucks?"

169.    Recently, a representative of another competing Norwegian salmon company told a BST executive words to the effect that it was "nice to see the inside of the building, Marchese would never let us in," when he attended a seafood show at BST's Boston warehouse.

170.    At or about this same time, another competing Norwegian salmon company executive told a BST leader that Marchese told him words to the effect of, "no room for you guys," implying that BST did not have the capacity to purchase salmon from the competitor.  This undermined BST's competitive position, while putting Vikenco AS at an unfair competitive advantage.

171.    In an e-mail thread on May 10, 2024, Marchese made clear where his loyalties lay, laying out his preference to curry favor with Vikenco AS to the detriment of Plaintiffs.

172.    In this e-mail, Marchese mentioned to a business acquaintance that during a recent trip, Plaintiffs wanted to visit a Norwegian salmon supplier besides Vikenco AS, but "Jonny [Småge] shut that down!" The business acquaintance replied, "You need only ONE supplier on fillets from Norway, Vikenco is the one and only you need 😊". Marchese replied, "My point exactly! It will be nice for you to educate fortune fish on this over a glass of wine and dinner in your home spot. 😊"

173.    Marchese's conduct again undermined BST's competitive position, while again putting Vikenco AS at an unfair competitive advantage.

174.    Upon information and belief, during his employment with BST, Marchese informed BST competitor Great Eastern of BST's pricing info for customer Customer 3, enabling Great Eastern to offer Customer 3 a lower price. This information is a trade secret of Plaintiffs and Confidential Information and Proprietary Information under Marchese's Restrictive Covenants. This action by Marchese harmed BST's revenue and its business relationship with Customer 3.

175.    In addition, upon information and belief, during his employment with BST, Marchese bought salmon products from one Vikenco AS competitor, sold them to BST retail customers at irregular markups, and refrained from sending the bill to the customers for a period beyond BST's normal billing period, essentially giving the customer an expanded period of credit beyond what was typically permitted by BST.

176.    Upon information and belief, Marchese did this to strengthen his relationship with the retail customers in anticipation of joining Vikenco and undercutting BST's business.

177.    In whole, while still employed by BST, Marchese was actively undermining BST's business interests for the benefit of Vikenco AS and Vikenco, either by locking BST into contracts

with Vikenco AS based on fictional competitive pricing, or actively sabotaging BST's relationships with vendors and customers.

**I.**    **Marchese's Resignation and Acceptance of Employment with Vikenco**

178.    On November 4, 2024, Vikenco was incorporated in Delaware.

179.    On January 21, 2025, Vikenco registered as a foreign corporation in Massachusetts, with a principal place of business as 4 Joanne Road, Burlington, MA 01803 which, upon information and belief, is the home of Marchese's father.

180.    Marchese is listed as Vikenco's registered agent on the registration paperwork filed with the Massachusetts Secretary of State.

181.    On December 6, 2024, Marchese submitted his resignation to BST. His employment with BST terminated on December 20, 2024.

182.    Upon information and belief, Marchese joined Vikenco as the Chief Executive Officer of its North America business in December 2024 and is a 15% owner of Vikenco.

183.    At that time of his resignation letter, Marchese told BST's President Larry Dore in an in-person conversation that he was joining Vikenco.

184.    Marchese expressly explained that Vikenco was not going to compete with BST, but rather that it was designed to be a U.S.-based presence for Vikenco AS to support its existing customers, and that Marchese's role with Vikenco would be beneficial to BST as it would enhance Vikenco AS's service to BST.

185.    Marchese expressly represented that he and Vikenco would not be pursuing BST's customers or competing with BST, but would be continuing Vikenco AS's current business in the United States.

186.    Marchese's representations turned out to be total falsehoods as BST has since learned that Marchese and Vikenco have been competing with and pursuing BST's customers in blatant disregard for Marchese's Restrictive Covenants, and, upon information and belief, they have relied upon Plaintiffs' Confidential and Proprietary Information in order to accomplish this.

187.    On April 2, 2025, BST received an inadvertent e-mail, titled "PO Issued", to Marchese's BST e-mail address, which had been sent by one of BST's significant customers, Customer 2, with whom Marchese had worked, and to whom Marchese had been introduced, during his employment with BST.

188.    Upon review of this e-mail, it became clear that this e-mail was intended to be sent to Marchese at his Vikenco address.  This e-mail made clear that Customer 2 was purchasing salmon directly from Vikenco and that Marchese and Vikenco were working to circumvent BST.

189.    Customer 2 is a retailer and traditionally had purchased salmon from BST, whose salmon could come from Vikenco AS or another supplier with whom BST worked.

190.    However, the April 2, 2024, e-mail made clear that Vikenco was now sidestepping BST to sell directly to Customer 2, and that Marchese was orchestrating this process— notwithstanding his post-employment non-competition and non-solicitation obligations owing to Plaintiffs.

191.    Specifically, the e-mail stated "PO [purchase order] issued."  It then proceeded to place an order for a specific amount of salmon fillets, with the direction that they be directed to Customer 2 through another U.S. distributor, Tampa Bay Fisheries Inc.

192.    In other words, Marchese was soliciting Customer 2 to purchase salmon directly from Vikenco, and thus was diverting business away from BST.

193.    Immediately upon receipt, Plaintiffs began investigating this matter.  However, before it could take action, it received a *second* e-mail from Customer 2, again inadvertently directed to Marchese's old BST e-mail address, instead of his Vikenco address.

194.    Specifically on April 15, 2025, BST received another e-mailed, titled "Pos attached", from Customer 2, attaching a second purchase order for salmon fillets.  This order was larger than the first order and reflected repeated orders over successive weeks.

195.    This time, however, the purchase order reflected that rather than the order being directed through a different distributor, it would be issued directly through "Vikenco North America."

196.    Not coincidentally, BST's business with Customer 2 has declined materially since Marchese left, while he is plainly doing business with Customer 2 at Vikenco.

197.    On April 25, 2025, BST received a *third* e-mail inadvertently directed to Marchese's old BST e-mail address. The e-mail was from a representative for a freight forwarder and said, "World wide just dropped off 85 cases for [Customer 5], the next truck that leaves for [Customer 5] is Monday . Let us know if you have a different plan ." [*punctuation as in original*].

198.    Customer 5 is also a BST customer, making this another example of Marchese and Vikenco competing with Plaintiffs and soliciting BST's customers.

199.    In short, Marchese and Vikenco are in possession of and relied upon Confidential Information and trade secrets belonging to Plaintiffs, which have been utilized to develop Vikenco's business, solicit Plaintiffs' clients and customers, and otherwise seriously undermine Plaintiffs' business and/or benefit Vikenco and its parent company.

200.    Moreover, because Marchese's position and business at Vikenco is substantially similar to his position and business with Fortune and BST, and Vikenco is now pursuing the same

customers, in the same markets, it is inevitable that Marchese will further rely upon and utilize, for his own benefit and the benefit of Vikenco, the competitively sensitive Confidential Information that he acquired, contributed to the development of, and/or was permitted to access while employed by Fortune and BST.

201.    Absent immediate injunctive relief, Marchese will benefit from his contractual breaches by, among other things, unlawfully competing with Plaintiffs in violation of the Restrictive Covenants for his personal benefit and to the detriment of Plaintiffs.

202.    Absent immediate injunctive relief, Vikenco will benefit from Marchese's theft of Plaintiffs' trade secrets and other Confidential Information, in violation of Marchese's Restrictive Covenants.

### J.    <u>Defendants' Breaches Caused Petitioner Irreparable Harm</u>

203.    Marchese's breach of his Restrictive Covenants has caused and threatens to cause Plaintiffs irreparable harm.

204.    If allowed to continue, Marchese's employment with Vikenco will cause Fortune and BST further irreparable harm in the form of loss of goodwill, loss of business, loss of customers, exposure of Confidential Information and business strategy, and a resulting loss of competitive advantage, among other things.

205.    Vikenco's access to Plaintiffs' Confidential Information is devastating for Fortune and BST because, among other things, Vikenco can misappropriate Plaintiffs' business and marketing strategies and readily ascertain and easily target Plaintiffs' customers and business partners and market to them its own products and services in a way that would allow it to unfairly compete with Plaintiffs' business.

206.    Accordingly, should Marchese be permitted to unlawfully compete with Fortune and BST in direct breach of the Restrictive Covenants, Plaintiffs will suffer the irreparable harm that accompanies the loss of business, goodwill and competitive advantage in the marketplace that such misconduct would cause.

207.    There are no unsatisfied conditions precedent to Fortune and BST's assertion of their claims here.

208.    Facing the imminent threats referenced herein, the need for the Plaintiffs to secure a temporary restraining order and preliminary injunction preventing breaches of Marchese's contractual obligations is clear.

209.    The clear factual allegations set forth herein reflect only what Fortune and BST have uncovered so far.

## COUNT I

*Misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1832* et. seq., *by Marchese and Vikenco*

210.    Plaintiffs repeat and reallege the forgoing paragraphs as if fully restated herein.

211.    As described above, Plaintiffs' customer lists and preferences, pricing, sales volume, warehouse and equipment configurations, and supplier pricing are trade secrets. These trade secrets implicate interstate commerce because Plaintiffs use them to conduct business across the United States. Their secrecy confers independent value because, if competitors learn this information, they could poach Plaintiffs' customers and business partners and even copy its unique business model. The secrets are not readily ascertainable because they were compiled over decades of painstaking trial and error. Nor has any other competitor managed to independently derive them. Finally, Plaintiffs protect these trade secrets by limiting access to only those who need the

information to perform their jobs and by requiring senior executives, such as Marchese, to sign restrictive covenants.

212. Marchese misappropriated these trade secrets by providing them to Vikenco and using them to steal Plaintiffs' customers and business partners. He had a duty, under both the Restrictive Covenants and norms of fair business practice, not to use these secrets to undermine Plaintiffs' business.

213. Vikenco misappropriated Plaintiffs' trade secrets by acquiring them via Marchese when it knew, or at least should have known, that he had a duty not to disclose them under the Restrictive Covenants and business norms.

214. Vikenco also misappropriated the trade secrets by using them to divert business from Plaintiffs to itself.

215. The misappropriation of these trade secrets caused Plaintiffs to suffer irreparable harm. Plaintiffs' customer lists and preferences, pricing, sales volume, warehouse and equipment configurations, and supplier pricing are integral parts of their business model and operation. Their disclosure and use by a competitor damage the entire network of customers and business partners that Plaintiffs have established over the decades. It will be difficult to measure just how many opportunities and productive business collaborations Plaintiffs will use from the misappropriation of these trade secrets. This entitles Plaintiffs to a temporary restraining order and preliminary and permanent injunction.

216. If the Court finds that any of Plaintiffs' injuries from the trade-secret misappropriation are at least partially compensable at law, Plaintiffs seek compensatory and punitive damages for the diminished value of its trade secrets and restitution for any profits unjustly earned by Marchese and Vikenco by using the trade secrets.

**COUNT II**

*Misappropriation of trade secrets under the Massachusetts Uniform Trade Secrets Act,*
*M.G.L. c.93, §§ 42, 42A-42G, by Marchese and Vikenco*

217.    Plaintiffs repeat and reallege the forgoing paragraphs as if fully restated herein.

218.    As explained in Count I, Plaintiffs' customer lists and preferences, pricing, sales volume, warehouse and equipment configurations, and supplier pricing are trade secrets.

219.    As described in Count I, Marchese and Vikenco have misappropriated these trade secrets. Marchese disclosed them to Vikenco in advance of his employment there and has improperly used them to solicit customers and business partners and undermine Plaintiffs. Vikenco has done the same through Marchese.

220.    Finally, as detailed in Count I, this misappropriation entitles Plaintiffs to a preliminary and permanent injunction as well as compensatory damages, punitive damages, and restitution.

**COUNT III**

*Breach of contract by Marchese*

221.    Plaintiffs repeat and reallege the forgoing paragraphs as if fully restated herein.

222.    Marchese entered into valid and enforceable contracts with Plaintiffs, the Restricted Covenants, which contain confidentiality, non-solicitation, and non-compete provisions. Marchese's continued employment at Fortune and BST, Transaction Bonus, Guaranteed Quarterly Bonus, and Profit Interests constituted adequate consideration for the contracts.

223.    Plaintiffs have upheld their end of the bargain.

224.    Marchese breached the confidentiality provisions by using Plaintiff's Confidential Information and Proprietary Information against Plaintiffs' interests and for the benefit of Vikenco.

225. Marchese breached the non-solicitation provision by inducing Plaintiffs' customers to reduce their business with Plaintiffs and increase their business with Vikenco.

226. Marchese breached the non-compete provisions by virtue of his employment with Vikenco, which is directly competing with Plaintiffs. Among other things, in his position at Vikenco, Marchese directly competes against Plaintiffs in the same market and business in the area of salmon purchasing, sale, packaging, processing, and distribution.

227. Marchese's breach of these provisions, both separately and combined, are the proximate cause of Plaintiffs' injuries. Unless he is stopped by this Court, he will continue to solicit and steal Plaintiffs' customers and business partners.

228. Not only have Plaintiffs lost profits, but Marchese's breaches have damaged, and will continue to damage, their intangible relationships with customers and business partners. This cannot be compensated by money damages alone.

229. These injuries are irreparable. First, Marchese agreed that breach of his Restrictive Covenants amounts to irreparable harm. Second, the aforementioned injuries will harm Plaintiffs in ways that are substantial yet difficult to precisely quantify. Because these losses are difficult to measure, money damages alone will not fully compensate Plaintiffs for their injuries.

230. In particular, the threat of future harm from Marchese's continued breach of the Restrictive Covenants justifies both a preliminary and permanent injunction requiring Marchese to abide by the Restrictive Covenants.

231. Because of Marchese's breach, Plaintiffs are entitled to an extension of the restricted period covered by the Restrictive Covenants.

232. Marchese's breach also entitles Plaintiffs to payment of reasonable attorneys' fees that Plaintiffs incur to enforce the Restrictive Covenants.

233.    In addition, to the extent this Court concludes that any of the injuries that Plaintiffs have suffered as a result of Marchese's breaches are compensable at law, Plaintiffs seek money damages for those losses.

## COUNT IV

*Breach of duty of loyalty by Marchese*

234.    Plaintiffs repeat and reallege the forgoing paragraphs as if fully restated herein.

235.    By virtue of his employment at and responsibilities for BST, Marchese had access to Plaintiffs' Confidential Information, Proprietary Information, and trade secrets.

236.    Indeed, Marchese occupied a position of trust and confidence at BST.

237.    Despite this, Marchese promoted his own interests in a manner injurious to Plaintiffs by misappropriation and sharing Plaintiffs' Confidential Information, Proprietary Information, and trade secrets while still employed at BST.

238.    Furthermore, while an employee at BST, Marchese actively worked to undermine Plaintiffs' business interests by soliciting their customers and suppliers and working with Vikenco to set up a competing entity.

239.    As such, Marchese violated his duty of loyalty to Plaintiffs.

240.    As a direct and proximate result of Marchese's wrongful conduct, Plaintiffs have suffered and will continue to suffer direct and consequential damages that cannot be adequately addressed at law.

241.    In particular, the threat of future harm from Marchese's breach of his duty of loyalty to Plaintiffs justifies both a preliminary and permanent injunction requiring Marchese enjoining him from competing with Plaintiffs.

242.    Marchese's breach also entitles Plaintiffs to payment of reasonable attorneys' fees that Plaintiffs incur to enforce the Restrictive Covenants.

243.    In addition, to the extent this Court concludes that any of the injuries that Plaintiffs have suffered as a result of Marchese's breach is compensable at law, Plaintiffs seek money damages for those losses.

## COUNT V

*Breach of covenant of good faith and fair dealing by Marchese*

244.    Plaintiffs repeat and reallege the forgoing paragraphs as if fully restated herein.

245.    Implied in the Restrictive Covenants is a covenant of good faith and fair dealing.

246.    Marchese breached the Restrictive Covenants by knowingly and willfully accepting employment with Vikenco in contravention of his obligations and through other direct and indirect acts which were wrongful, without justification, and in violation of the covenant of good faith and fair dealing owed to Plaintiffs.

247.    Marchese acted in the utmost bad faith by soliciting Plaintiffs' customers and suppliers, and he has used and intends to use, and shared Plaintiffs' Confidential Information, Proprietary Information, and trade secrets to unfairly compete with Plaintiffs, in violation of the Restrictive Covenants.

248.    Marchese's actions constituted and continue to constitute a breach of the covenant of good faith and fair dealing implied in his Restrictive Covenants with Plaintiffs.

249.    As a direct and proximate result of Marchese's breach of his covenant of good faith and fair dealing, Plaintiffs have been irreparably injured, and there is no adequate remedy at law.

250.     In particular, the threat of future harm from Marchese's continued breach of the Restrictive Covenants justifies both a preliminary and permanent injunction requiring Marchese to abide by the Restrictive Covenants.

251.     Marchese's breach also entitles Plaintiffs to payment of reasonable attorneys' fees that Plaintiffs incur to enforce the Restrictive Covenants.

252.     In addition, to the extent this Court concludes that any of the injuries that Plaintiffs have suffered as a result of Marchese's breaches are compensable at law, Plaintiffs seek money damages for those losses.

## COUNT VI

*Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by Marchese*

253.     Plaintiffs repeat and reallege the forgoing paragraphs as if fully restated herein.

254.     Plaintiffs maintained their Confidential Information, Proprietary Information, and trade secrets on their protected computer servers.

255.     Marchese knowingly and with intend to defraud Plaintiffs, accessed these servers, without Plaintiffs' permission or knowledge, to obtain Plaintiffs' valuable Confidential Information, Proprietary Information, and trade secrets.

256.     As detailed in Count IV, Marchese breached his duty of loyalty to Plaintiffs.

257.     Even if Marchese was authorized to access the sensitive information stored on Plaintiffs' computer servers, he exceeded his authorized access by breaching of his duty of loyalty to Plaintiffs.

258.     Marchese used the materials he acquired from Plaintiffs' computer servers to advance interests adverse to Plaintiffs, including using the information to undermine Plaintiffs and advance Vikenco's business interests.

259.    Furthermore, given that Plaintiffs have customers throughout the United States and suppliers throughout the world, Marchese used his computer in a way that affected interstate and foreign commerce.

260.    Marchese also used Plaintiffs' servers and e-mail system to communicate regularly with Vikenco to establish a competing entity and used Plaintiffs' servers to establish a competing entity.

261.    Marchese's intentional and unlawful conduct caused damage and losses in excess of $5,000.

262.    If the Court finds that any of Plaintiffs' injuries from Marchese's use of its servers to misappropriate their sensitive information and establish a competing business are at least partially compensable at law, Plaintiffs seek compensatory damages, punitive damages, and restitution.

## COUNT VII

*Tortious interference with a contract by Vikenco*

263.    Plaintiffs repeat and reallege the forgoing paragraphs as if fully restated herein.

264.    As explained above, the Restrictive Covenants constitute valid contracts between Marchese and Plaintiffs.

265.    Vikenco was aware, or should have been aware, of the Restrictive Covenants and their terms, as Marchese was obligated to inform them of his obligations under the Restrictive Covenants.

266.    Vikenco induced Marchese to breach the Restrictive Covenants by hiring him into a position that would directly compete with Plaintiffs and prompting him to solicit the same customers and business partners he worked with at Fortune and BST. Moreover, it knew or should

have known that it would be impossible for Marchese to perform his duties without improperly using the Confidential Information, Proprietary Information, and trade secrets he gained at Fortune and BST because that information involved the very customers and business partners that it induced him to solicit.

267.    As detailed above, the inducement of these breaches harmed Plaintiffs by depriving them of customers and business partners while diminishing the value of their Confidential Information, Proprietary Information, and trade secrets.

268.    Vikenco's inducement caused Marchese to breach the Restrictive Covenants.

269.    Plaintiffs suffer, and will continue to suffer, irreparable harm because of Vikenco's tortious interference. For the same reasons given above, Marchese's breaches, which Vikenco induced, amount to an irreparable injury. The threat that these breaches will continue entitles Plaintiffs to both a preliminary and permanent injunction.

270.    Plaintiffs also seek compensatory damages for any injuries that the Court deems compensable at law.

## COUNT VIII

*Common law civil conspiracy by Marchese and Vikenco*

271.    Plaintiffs repeat and reallege the forgoing paragraphs as if fully restated herein.

272.    As detailed above, Marchese and Vikenco collaborated to repeatedly breach the Restrictive Covenants, tortiously interfere with the Restrictive Covenants, and misappropriate Plaintiffs' Confidential Information, Proprietary Information, and trade secrets. Their conduct was part of a joint scheme to undermine Plaintiffs' business for their own benefit.

273.    Their conspiracy injured Plaintiffs by depriving them of business opportunities, undermining their relationships with customers and business partners, and diminishing the value of their trade secrets and other proprietary information.

274.    As explained above, Plaintiffs seek a preliminary and permanent injunction because its injury is irreparable. It will be difficult to measure the full value of its lost profits, lost consumer goodwill, lost business relationships, and the diminished value of its proprietary information.

## COUNT IX

*Violation of the Massachusetts Unfair Trade Practices Act, M.G.L. c.93A, §§ 2,* et. seq.*, by Marchese and Vikenco*

275.    Plaintiffs repeat and reallege the forgoing paragraphs as if fully restated herein.

276.    Marchese committed unfair and deceptive acts by misappropriating Plaintiffs' Confidential Information, Proprietary Information, and trade secrets, conspiring with Vikenco to start a competing entity, and soliciting Plaintiffs' customers in contravention of his Restrictive Covenants.

277.    Vikenco committed unfair and deceptive acts by inducing Marchese to violate his Restrictive Covenants and conspiring with him to start a competing entity.

278.    Because these acts, which occurred primarily and substantially in Massachusetts, pertained to business conduct and Plaintiffs' business, they involved trade and commerce.

279.    These acts were immoral, unethical, and unscrupulous and caused substantial injury to Plaintiffs' business and industry goodwill.

280.    These acts were willful and knowing.

281.    Furthermore, Marchese and Vikenco's actions were intended to secure benefits for Marchese and Vikenco.

282.    To the extent this Court concludes that any of the injuries that Plaintiffs have suffered as a result of Marchese and Vikenco's unlawful conduct are compensable at law, Plaintiffs seek money damages for those losses.

283.    Defendants' unlawful conduct also entitles Plaintiffs to payment of reasonable attorneys' fees.

## COUNT X

*Breach of the faithless service doctrine by Marchese*

284.    Plaintiffs repeat and reallege the forgoing paragraphs as if fully restated herein.

285.    As established previously, as a senior executive at BST, Marchese was in a position of trust and confidence and owed a duty of loyalty to Plaintiffs.

286.    Marchese violated this duty by misappropriating Plaintiffs' Confidential Information, Proprietary Information, and trade secrets, soliciting their customers, and working with Vikenco to establish a competing entity.

287.    This conduct resulted in the loss of business for Plaintiffs and hurt their goodwill in the seafood industry.

288.    Marchese's conduct was a direct and proximate cause of Plaintiffs' injuries.

289.    Because the value of Plaintiffs' injuries exceeds the value of Marchese's services to Plaintiffs during his period of disloyalty, Plaintiffs are entitled to an equitable forfeiture of Marchese's compensation during the period in question.

## **PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons and the reasons set forth in the accompanying memorandum of law, Plaintiffs respectfully request:

(a) pursuant to Fed. R. Civ. P. 65, entry of a Preliminary Injunction and Temporary Restraining Order be entered:

a. enjoining Marchese and Vikenco, with respect to the latter to the extent such relies upon, arises from or relates to information provided to Vikenco by Marchese or based upon information from Plaintiffs, from competing with Plaintiffs or engaging in employment with or providing independent contractor services for Vikenco or any other person, corporation, firm or other entity that provides any service or services that compete with any service or services offered by Fortune and BST within the Commonwealth of Massachusetts until the Court issues permanent injunctive relief or the time set forth in the parties' agreements expires;

b. enjoining Marchese and Vikenco from directly or indirectly soliciting, servicing, or catering to any of Plaintiffs' customers whom Marchese solicited, served, or catered to on behalf of Plaintiffs or with whom he became acquainted during the course of his employment with Plaintiffs until the Court issues permanent injunctive relief or the time set forth in the parties' agreements expires;

c. enjoining Marchese and Vikenco from directly or indirectly calling upon, influencing, or attempting to influence any of Plaintiffs' customers to transfer their business or patronage from Plaintiffs to himself, to Vikenco,

or to any other person, corporation, firm, company, or business entity engaged in a business similar to Plaintiffs' business until the Court issues permanent injunctive relief or the time set forth in the parties' agreements expires;

d.  enjoining Marchese and Vikenco from directly or indirectly diverting or attempting to divert any of Plaintiffs' customers or any of the business or patronage of such customers until the Court issues permanent injunctive relief or the time set forth in the parties' agreements expires;

e.  enjoining Marchese from directly or indirectly hiring or attempting to hire, solicit, induce, recruit or encourage any other employees or agents of Plaintiffs to terminate their employment or agency relationship with Plaintiffs in order to work for any person, corporation, firm, company or business entity other than Plaintiffs until the Court issues permanent injunctive relief or the time set forth in the parties' agreements expires;

f.  enjoining Marchese and Vikenco from using in any, directly or indirectly, or disclosing to any person, firm, corporation or other entity, any of Plaintiffs' Confidential Information or Proprietary Information, as such terms are defined in the Restrictive Covenants and under the Defend Trade Secrets Act and Massachusetts Uniform Trade Secrets Act, and directing Marchese and Vikenco to immediately return to Plaintiffs all such materials, and all property of Plaintiffs, and further directing Marchese and Vikenco to immediately delete or erase any copies of the foregoing contained or stored on any electronic computer devices or computer files within their

possession, custody or control until the Court issues permanent injunctive relief;

g.  enjoining and restraining Marchese, and anyone acting in concert with him or on his behalf, including without limitation Vikenco, from otherwise violating his Restrictive Covenants with Fortune and BST until the Court issues permanent injunctive relief or the time set forth in the parties' agreements expires; and

h.  enjoining and restraining Vikenco from employing Marchese in violation of his Restrictive Covenants;

(b)  awarding Plaintiffs compensatory, punitive and all other available monetary damages in an amount to be determined at trial, including treble damages under M.G.L. c. 93A;

(c)  awarding Plaintiffs the costs and disbursements of this action, including attorneys' fees incurred by Plaintiffs incurred in connection with this action; and

(d)  granting Plaintiffs such other and further relief as the Court may deem just, equitable, and proper.

Dated: Boston, Massachusetts
        April 28, 2025

BOSTON SWORD & TUNA, LLC and
FORTUNE INTERNATIONAL, LLC,

By its attorneys,

*/s/      Bruce Barnett*
Bruce Barnett, Esq. (BBO #647666)
DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, Massachusetts 02110
Tel.: (617) 406-6000
bruce.barnett@us.dlapiper.com

Garrett Kennedy, Esq.*
DLA Piper LLP (US)
1251 Avenue of the Americas
27th Floor
New York, NY 10020-1104
Tel: 212-335-4500
garrett.kennedy@us.dlapiper.com

* Application for admission pro hac vice pending

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I affirm this 28th day of April, 2025, under penalty of perjury, that (i) I am the President of Boston Sword & Tuna, LLC, Plaintiff in the action *Boston Sword & Tuna, LLC and Fortune International, LLC v. Christopher J. Marchese and Vikenco North America, Inc.*, (ii) I have read the foregoing Verified Complaint, and the matters stated therein are true to my knowledge, except as to the matters alleged on information and belief, and (iii) I understand that this document may be filed in an action or proceeding in a court of law.

Larry Dore
President, Boston Sword & Tuna, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 29, 2025.  I further certify that this document was emailed to the defendants on April 28, 2025.

*/s/ Bruce Barnett*

Bruce Barnett