# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BOSTON SWORD & TUNA, LLC and FORTUNE
INTERNATIONAL, LLC,

                    Plaintiffs,

  v.

CHRISTOPHER J. MARCHESE and VIKENCO NORTH
AMERICA, INC.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. _____

**ORAL ARGUMENT
REQUESTED**

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## Table of Contents

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ...............................................................................................3

    I.      The Parties ....................................................................................................3

    II.    Plaintiffs' Protectable Interests & Efforts to Protect Same ..........................4

         A.    Marchese's Transaction Bonus Agreement ......................................6

         B.    Marchese's Employee Restrictive Covenants Agreement ....................6

         C.    The 2020 Profits Interest Plan and Award Agreements  Contain Additional Post-Employment Restrictions.......................................................7

         D.    Marchese's Employment Agreement with BST ...................................8

    III.   Marchese & Vikenco Misappropriate Plaintiffs' Confidential & Proprietary Information and Trade Secrets, While Setting Up a Competing Business .................9

ARGUMENT ...............................................................................................................12

    I.      Legal Standard .............................................................................................12

    II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIMS ..........................12

         A.    Marchese and Vikenco Misappropriated Plaintiffs' Trade Secrets. ....................12

         B.    Marchese Breached the Restrictive Covenants .....................................15

    III.   PLAINTIFFS HAVE SUFFERED AND WILL SUFFER IRREPARABLE HARM...............................................................................................................18

    IV.   THE BALANCE OF HARM FAVORS PLAINTIFFS.............................................19

    V.    PUBLIC POLICY FAVORS PLAINTIFFS.........................................................20

CONCLUSION............................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*All Stainless. Inc. v. Colby*,
    364 Mass. 773 (1974) ....................................................................16, 17, 18

*Aspect Software, Inc. v. Barnett*,
    787 F. Supp. 2d 118 (D. Mass. 2011) ............................................. *passim*

*Blackwell v. E.M. Helides, Jr., Inc.*,
    368 Mass. 225 (1975) ....................................................................15

*BNY Mellon, N.A. v. Schauer*,
    2010 WL 3326965 (Mass. Super. May 14, 2010)....................................16

*Bowne, Inc. v. Levine*,
    7 Mass. ....................................................................15

*Frequency Thera., Inc. v. Weber*,
    2018 WL 6933369 (Mass. Super. Nov. 28, 2018)....................................19

*FrontRunner HC, Inc. v. Waveland RCM, LLC*,
    2020 WL 7321161 (D. Mass. Dec. 11, 2020)....................................14

*Incase Inc. v. Timex Corp.*,
    488 F.3d 46 (1st Cir. 2007)....................................................................13

*Jet Spray Cooler, Inc. v. Crampton*,
    377 Mass. 159 (1979) ....................................................................21

*KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*,
    2021 WL 2982866 (D. Mass. July 15, 2021)....................................13

*Lombard Med. Techs., Inc. v. Johannessen*,
    729 F. Supp. 2d 432 (D. Mass. 2010) ....................................................................20

*Marine Contractors Co. v. Hurley*,
    365 Mass. 280 (1974) ....................................................................16, 17

*McGuire v. Reilly*,
    260 F. 3d 36 (1st Cir. 2001)....................................................................12

*Netcracker Tech. Corp. v. Laliberte*,
    2020 WL 6384312 (D. Mass. Oct. 30, 2020)....................................13, 15

*Optos, Inc. v. Topcon Med. Sys., Inc.*,
    777 F. Supp. 2d 217 (D. Mass. 2011) ....................................................................14

*Philip Morris v. Harshbarger*,
    159 F.3d 670 (1st Cir. 1998) ...................................................................................12

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F. 3d 12 (1st Cir. 2001) ...................................................................................12

*Shipley Co. v. Kozlowski*,
    926 F. Supp. 28 (D. Mass. 1996) ...........................................................................17

*SimpliVity Corp. v. Moran*,
    2016 WL 5122671 (Mass. Super. Aug. 14, 2016) ...................................................17

*Southwick Clothing LLC v. GFT (USA) Corp.*,
    2004 U.S. Dist. LEXIS 25336 (S.D.N.Y. Dec. 13, 2004) .......................................13

*Tuckerbrook Alternative Invs., LP v. Banerjee*,
    2008 WL 2356349 (D. Mass. June 4, 2008) ...........................................................20

*Whitinsville Plaza, Inc. v. Kotseas*,
    378 Mass. 85 (1979) ...............................................................................................16

**Statutes**

18 U.S.C. § 1836(b)(1) .....................................................................................................13

18 U.S.C. § 1839(5) ..........................................................................................................15

M.G.L. c. 93, § 42 .......................................................................................................13, 15

M.G.L. c. 149 § 24L(b)(ii) ...............................................................................................16

M.G.L. c. 93A, §§ 2, *et. seq.*...........................................................................................13

Fed. R. Civ. P. 65 ..............................................................................................................21

This memorandum is submitted on behalf of Plaintiffs Boston Sword & Tuna, LLC ("BST") and Fortune International, LLC ("Fortune"; together, "Plaintiffs"), in support of their motion, pursuant to Fed. R. Civ. P. 65, for a temporary restraining order and preliminary injunction against Defendants Christopher Marchese ("Marchese") and Vikenco North America, Inc. ("Vikenco"; together, "Defendants").[1]

## PRELIMINARY STATEMENT

Plaintiffs respectfully ask this Court to (i) enjoin Marchese from further violations of his non-competition, non-solicitation and confidentiality covenants; (ii) enjoin Vikenco from employing Marchese and soliciting or servicing Plaintiffs' customers and clients; (iii) enjoin Defendants from using Plaintiffs' misappropriated confidential information and trade secrets; and (iv) compel Defendants to return all misappropriated information.

Immediate injunctive relief is essential. Defendants have engaged in an ongoing scheme to misappropriate Plaintiffs' critical confidential information and trade secrets, which they have used to create a competing business and solicit Plaintiffs' clients, in violation of Marchese's post-employment restrictive covenants. Defendants have been caught red-handed: Plaintiffs have located, *inter alia*, numerous e-mails from Marchese to Vikenco executives forwarding confidential information – e.g., customer lists and a literal blueprint of BST's facilities – that allowed Defendants to quickly build out a competing business. Now, Plaintiffs have received three inadvertent e-mails confirming Marchese is soliciting Plaintiffs' customers. This must stop.

As background, BST, which is wholly owned by Fortune, is engaged in the highly competitive business of purchasing, processing and distributing seafood and related products. This

---

[1] Notice was provided on the morning of April 28, 2025, via e-mail to Mr. Marchese and two other Vikenco executives, as well as Marchese's prior counsel, including that injunctive was to be sought on April 29, 2025 before this Court.

business involves the purchase and sale of hundreds of thousands of pounds of fish annually, with annual sales in the hundreds of millions of dollars. It is also a complex business which involves a web of important relationships, including with suppliers, customers and logistics providers spread across the globe. Thus, Plaintiffs have spent considerable time and money developing their business, operations, and important business relationships.

Marchese is a former C-suite executive for BST who is subject to non-competition, non-solicitation and confidentiality obligations. He resigned in December 2024 to join Vikenco, a recently formed U.S. subsidiary of Norwegian salmon supplier Vikenco AS, which latter company has supplied salmon to BST for more than a decade.

When Marchese left BST, he promised that Vikenco was non-competitive, but that it would merely support Vikenco AS's existing U.S. relationships, such as BST. This was a lie, which came to light when Plaintiffs received an e-mail from a client that was inadvertently sent to Marchese's old BST e-mail account, instead of his Vikenco address. This e-mail made clear that Marchese was violating his post-employment non-solicitation and non-competition covenants, as this BST client had made a purchase from Vikenco, not BST. Plaintiffs have since received another similar e-mail from that customer, and another from a second customer.

Plaintiffs investigated and learned that, unbeknownst to them, Marchese had spent *six months* prior to his resignation funneling confidential information and trade secrets to Vikenco AS executives, brazenly using Marchese's BST e-mail address to do so. This information was, in turn, used to set up Vikenco, as the misappropriated information and trade secrets allowed Defendants to shortcut building out a competitive business at a fraction of the cost and time.

Defendants' conduct is causing, and will continue to cause, serious and irreparable harm, absent immediate relief from this Court. Evidence demonstrates that Defendants misappropriated

information and trade secrets regarding BST's largest customers, and further that Defendants have directly solicited at least one of these customers, and Plaintiffs anticipate discovery will show that Defendants have, in fact, solicited many more. Without relief, any award granted solely at law will be meaningless because, as described herein, the grave likelihood of significant injury being to Plaintiffs will have become irreparable by the time such an award is rendered.

## STATEMENT OF FACTS[2]

### I.   **The Parties**

Plaintiffs are engaged in the highly competitive business of purchasing, processing and distributing protein-based foods, including seafood, poultry and beef throughout the United States. Verified Complaint ("Compl.") ¶ 24. BST focuses on seafood and services more than 650 retail, wholesale and distributor customers. *Id.* ¶ 35. BST is wholly owned by Fortune. *Id.* ¶ 17.

Marchese is a former BST executive. Compl., ¶ 6. He started with BST in 2011 and worked there until his resignation in December 2024. *Id.* ¶¶ 27, 29-31, 181. He was a senior executive, serving as Chief Operating Officer from 2019 to November 2024, and subsequently as Director of Salmon and Key Accounts. *Id.* ¶¶ 29, 30, 32. He ran BST's salmon division for more than 13 years; this involved overseeing the purchase, sale, packaging, processing, and distribution of more than 300,000 pounds of salmon per week. *Id.* ¶ 31.  By virtue of his employment by BST, Marchese was introduced to and interacted with BST's key clients, customers, suppliers and other strategic relationships, and he had access to their most sensitive information, including customer preferences, pricing, sales volume, order histories and other critical information. *Id.* ¶ 32.

---

[2] The facts set forth in the accompanying Verified Complaint, dated April 28, 2025, are incorporated herein. Additional exhibits are attached to the Declaration of Garrett D. Kennedy, dated April 28, 2025 ("Kenned Decl.").

Vikenco AS is a Norwegian salmon supplier that has supplied salmon to BST for roughly 15 years. Compl. ¶¶ 109-110. Vikenco is Vikenco AS's recently formed North American subsidiary; Vikenco was incorporated in November 2024 – just before Marchese's departure from BST. *Id.* ¶¶ 108, 112, 113, 115. Vikenco's corporate filings reflect that its senior executives are Vikenco AS employees, while Marchese is its CEO, registered agent and a 15% owner. *Id.* ¶ 111, 115, 180. Prior to his resignation, Marchese informed Plaintiffs that Vikenco was intended to support Vikenco AS's U.S. business and would not compete with BST; this was untrue. It has since become clear that Defendants are directly competing with Plaintiffs, and are using their confidential and proprietary information and trade secrets to do so. *Id.* ¶ 2, 115, 116, 199.

## II.    Plaintiffs' Protectable Interests & Efforts to Protect Same

Plaintiffs have developed and continue to develop and maintain confidential and proprietary information that is essential to their market position and industry success. Compl. ¶ 36. This includes information about, *inter alia*, clients and prospective clients; client preferences; contractual arrangements; business strategies; financial, pricing and performance information; sales figures; and operational information, like Plaintiffs' processing and packaging line configurations and technical specifications (hereinafter "Confidential Information"). *Id.* ¶ 37. The Confidential Information is essential to Plaintiffs' business and has been developed over time at great expense; it provides Plaintiffs with a competitive advantage over its competitors, to whom it would be incredibly valuable, and is essential to BST's ability to run its operations. *Id.* ¶¶ 38-39.

In addition, Plaintiffs have spent substantial funds and dedicated extensive efforts to developing arrangements with suppliers, as well as logistics and import processing and handling arrangements; this is an intricate web of third parties that spans various countries and gives Plaintiffs a competitive advantage. Compl. ¶¶ 40, 43. The goodwill associated with these relationships would be highly valuable to a competitor, and thus information about these

arrangements and relationships is kept secret and not made accessible to third parties. *Id.* ¶¶ 41-42, 44. This goodwill and the related Confidential Information gives Fortune and BST a distinct competitive advantage over its competitors. *Id.* ¶ 43.

Plaintiffs have further expended substantial resources to cultivate customer relationships, including establishing longstanding goodwill and building a reputation for high quality in the industry. Compl. ¶¶ 43-44. This includes, for instance, developing bespoke and competitive customer pricing models, which information would be incredibly valuable to competitors, since it would allow them to undercut Plaintiffs' business. *Id.* ¶ 44. To protect their competitive advantage, the companies maintain confidentiality as to the nature and breadth of services and pricing models provided to customers. *Id.* The identity of Plaintiffs' customers, the terms of their service agreements with Plaintiffs, and the pricing models applied for Plaintiffs' service offerings are a source of independent economic value to Plaintiffs. *Id.* ¶ 45.

Plaintiffs protect their Confidential Information and goodwill in numerous ways, including through employment and post-employment restrictive covenants that, *inter alia*, prohibit the use and disclosure of Confidential information, as well as competition and solicitation of customers and clients. *See* Compl. ¶ 42, Ex. A §§ 5, 8, Ex. B §§ III, IV(G), Ex. C §§ 3, 5, 9, Ex. D §§ 3-5, 7, 9, 20. Senior personnel such as Marchese are required to execute such agreements. *Id.*

Marchese has entered into numerous agreements with Plaintiffs that include non-competition and non-solicitation covenants, as well as obligations to not disclose or use Confidential Information. *See* §§ II(A)-(D), *infra.* These covenants appears in four agreements: (i) the Transaction Bonus Agreement with Fortune, dated May 5, 2023, (the "Transaction Bonus Agreement"); (ii) the Employee Restrictive Covenants Agreement between with BST, dated May 8, 2023 (the "Employee Restrictive Covenants Agreement"); (iii) the Employment, Nondisclosure,

and Noncompetition Agreement with BST, dated September 28, 2020 (the "Employment Agreement"); and (iv) the Confidentiality & Restrictive Covenants Agreement, dated May 8, 2023 (the "CRCA"; together, the "Restrictive Covenants").

### A.  Marchese's Transaction Bonus Agreement

As part of Fortune's acquisition of BST, on May 5, 2023, Marchese entered into the Transaction Bonus Agreement. Compl. ¶¶ 48-55. Marchese received a $200,000 Transaction Bonus for executing this agreement; in exchange, Marchese agreed to keep confidential and not disclose or use Plaintiffs' Confidential Information (as defined therein), both during and after his employment.  *See* Compl. Ex. A § 5(e). He also agreed not to directly or indirectly participate in the unauthorized use, disclosure or conversion of any Confidential Information. *See id.* § 5(b).

The Transaction Bonus Agreement includes a narrowly tailored non-solicitation covenant to protect Plaintiffs' goodwill and Confidential Information. Compl. Ex. A, § 5(c)(i). Specifically, Marchese agreed that during his employment and for two (2) years thereafter, he would not:

> directly or indirectly, for yourself or on behalf of or in connection with any other person, entity or organization, call on, solicit, have contact with, or service any customer, candidate, supplier or business relation of the Company Group with whom you did business or about whom you received or to whom you provided Confidential Information in order to (i) induce or attempt to induce such person or entity to cease doing business with, or reduce the amount of business conducted with, the Company Group, or (ii) in any way interfere with the relationship between any such person or entity and the Company Group.

*Id.* Marchese consented to the issuance of an injunctive relief, without bond. *See Id.* § 8.

### B.  Marchese's Employee Restrictive Covenants Agreement

Also at or about the time of BST's acquisition by Fortune, Marchese entered into the Employee Restrictive Covenants Agreement. Compl. ¶ 56. This agreement prohibited his disclosure or use of Confidential Information (*id.* ¶ 56, Ex. B, § III(B)(i)) and he further agreed that for one (1) year following his employment with BST, he would not, directly or indirectly,

> i. solicit, attempt to solicit, transact with, attempt to transact with, or receive or attempt to receive any economic benefit from any customers of Company that Employee will build or has built relationships with on a regular basis, as a result of employment with Company for the purpose of engaging in activities directly or indirectly competitive with the business of the Company.
>
> ii. call upon or service any customer which the Employee will have any interactions or relationships with or had any interactions or relationships with, for the purpose of selling or attempting to sell to any such customer any products or services Employee is selling or will sell on behalf of Company.
>
> iii. solicit, induce or attempt to solicit or induce any then current customer of the Company to end or modify its use of the Company's products or services. Current customer shall mean any person or entity to which the Company has sold product to or has received payment from during the one-year period prior to the end of Employee's employment.

*Id.* § III(D).  He also agreed that for one (1) year post-employment, he would not "interfere with the relationship between [Plaintiffs] and any of their respective vendors, suppliers, customers, consultants, independent contractors, landlords or other strategic partners." *Id.* § III(F).

Marchese consented to issuance of injunctive relief to prevent and/or remedy an actual or threatened breach of his restrictive covenants. Compl. Ex. B, § III(G).

### C. The 2020 Profits Interest Plan and Award Agreements Contain Additional Post-Employment Restrictions

At or about this same time, Marchese received a profits interests grant pursuant to the 2020 Profits Interest Plan and Award Agreements, becoming a partner in Dory Holdings LLC, Plaintiffs' ultimate parent. *See* Compl. ¶ 80. In exchange, Marchese signed the CRCA, including non-competition, non-solicitation and confidentiality covenants.  *See id.*, Ex. D §§ 3, 4. Initially, he agreed that, for one (1) year post-separation, he would not:

> directly or indirectly, whether as a principal, director, employee, agent, distributor, representative, stockholder or otherwise, participate in any position or role with a Competing Business . . . in the Restricted Area (as the term is defined below) that would involve [Marchese] Participant providing services, or Participant supervising services, that are similar in function or purpose to those Participant performed on behalf of the Company Group . . . .

*Id.*, Ex. D § 3(a). "Competing Business" is defined as "any person or entity engaged in, or planning to engage in, the business of providing Competitive Services in the Restricted Area." *Id.* "Competitive Services" included "service offerings or products that compete with, or are similar in function or purpose to service offerings and products of [Plaintiffs] during the term of [Marchese's] employment . . . ." *Id.* The "Restricted Area" included any place in which Marchese provided services or had a "material presence or influence" for Plaintiffs. *Id.* § 3(a).

Marchese also agreed that, for one (1) year post-employment, he would not solicit Plaintiffs' customers "to cease doing business with the [Plaintiffs], or transact business related to any Competitive Services from any Covered Customer." *See* Compl. Ex. D, § 3(b). "Covered Customers" include any person with whom Marchse "had business-related contact with or had access to Confidential Information about" during the two-years prior to his separation. *Id.* § 3(b).

Marchese also agreed not to use Plaintiffs' Confidential Information for his benefit or that of another person or entity. *See* Compl. Ex. D, § 4(a). Marchese affirmed Plaintiffs "would suffer irreparable harm" if he breached the CRCA, and money damages would be inadequate. *See* Compl. Ex. D, §§ 3, 5.

### D.  Marchese's Employment Agreement with BST

Marchese also is subject to post-employment restrictions predating Fortune's acquisition of BST.  On September 28, 2020, he entered into the Employment Agreement with BST, which included non-competition, non-solicitation and Confidential Information covenants. Compl. ¶ 66. In exchange, as he received additional consideration, including, *inter alia*, (i) a guaranteed quarterly bonus of $3,750, (ii) a $.10 royalty on each salmon burger sold, and (iii) a guaranteed two-year term of employment (other than termination for Cause). Compl. ¶ 66, Ex. C § 2.

In exchange, Marchese agreed to a reasonable non-competition restriction. *See* Compl. Ex. C § 7(b).  This covenant provides that for one (1) year post-employment, he may not:

(iv) sell or market or assist any other person in selling or marketing any product or service that competes, directly or indirectly with any product or service manufactured, sold or under development by BST at the time the Employee's employment with BST is terminated; or

(v) research, develop or manufacture or assist any other person in researching, developing or manufacturing any product or service that competes with any product or service conceived, manufactured, sold or under development by BST at the time the Employee's employment with BST is terminated.

*Id.* The non-compete period "shall be extended to two (2) years upon Employee's breach of his/her fiduciary duty and/or unlawful taking . . . of property belonging to the Company." *Id.*

In addition, Marchese agreed to certain non-solicitation obligations, including prohibitions that for one (1) year post employment (subject to the two-year extension above), he would not

(i) hire or attempt to hire or assist any other person in hiring or attempting to hire any employee of BST; or

(ii) encourage or assist any other person in encouraging any director, officer, employee, agent, consultant or any other person affiliated with BST to terminate or alter his or her or its relationship with BST; or

(iii) encourage or assist any other person in encouraging any customer or supplier of BST to terminate or alter its relationship with BST . . . .

Compl. Ex. C § 7(b). Marchese also agreed not to use in any way, directly or indirectly, or to disclose to any person, firm, corporation, or other entity, except for the benefit of BST, any of BST's "Proprietary Information," as defined therein. *See id.* § 5.

Marchese expressly consented to injunctive relief to prevent and/or remedy an actual or threatened breach of the restrictive covenants in his Employment Agreement. *See* Ex. C, § 9.

## III.  Marchese & Vikenco Misappropriate Plaintiffs' Confidential & Proprietary Information and Trade Secrets, While Setting Up a Competing Business

Marchese joined BST in or around 2011 and quickly rose through the company's ranks. Compl. ¶¶ 27, 29, 30. BST and, later, Fortune invested considerable resources into training and promoting Marchese, making him the "public face" of BST's salmon products as he worked

directly with many of Plaintiffs' most important seafood customers, suppliers, and logistics and cold-storage providers. *Id.* ¶ 97. BST introduced Marchese to its business partners, including Vikenco; Marchese did not bring any business relationships to BST. *Id.* ¶¶ 99, 112.

Marchese was well paid for his services—in 2024 he earned more than $330,000 and in 2023 he earned nearly $550,000—and was held in a "position of special trust and confidence." Compl. ¶¶ 101-102, Ex. A, § 5(a). As such, Marchese had access to BST's most sensitive Confidential Information, including, *inter alia*, monthly revenue figures; customer names, preferences, arrangements, and sales volume; supplier names, pricing, and product lists; and BST's logistics, warehouse and equipment configurations. *Id.* ¶ 103. As BST's salmon leader, Marchese regularly used and contributed to this information, actively buying and selling salmon products on BST's behalf, negotiating pricing with suppliers and customers, and arranging BST's trucking and distribution operations for its salmon products. *Id.* ¶¶ 104-106.

Despite this, while Marchese was still employed by BST, he and Vikenco engaged in a systematic scheme to steal Plaintiffs' confidential and proprietary information and trade secrets. Compl. ¶¶ 114. Over approximately six months prior to his resignation, Marchese, using his BST e-mail account, repeatedly forwarded highly sensitive information—including customer lists, purchase histories, pricing data, logistics details, and even facility schematics and equipment layouts—to senior executives of Vikenco and to his personal email. *Id.* ¶¶ 2, 4, 7, 117, 122-124, 126-131, 138-153. This information, developed at great expense to Plaintiffs, provided an extensive blueprint of their business operations and competitive strategies. *Id.* ¶¶ 36, 40, 43, 132, 138, 140-41, 144, 148, 153, 158.

Marchese's conduct was egregious. He provided Vikenco with detailed customer lists and sales volumes, including regional breakdowns, enabling Vikenco to target and undercut Plaintiffs

with key customers. Compl. ¶¶ 105, 123-126; Kennedy Decl., Exs. 1-2. He forwarded to Vikenco the preferences, cost structures, contact information, and negotiation details for Plaintiffs' major clients such as Customers 1 through 4[3]—collectively representing more than $150 million of sales by BST in 2024 alone. *Id.* ¶¶ 127-137; Kennedy Decl., Exs. 3, 4, 5. Marchese also sent to Vikenco and his personal email account proprietary information about BST's processing systems, warehouse layouts, and logistics costs, giving Vikenco a significant unfair advantage in establishing its U.S. operations. *Id.* ¶¶ 138-144, 149-153; Kennedy Decl., Exs. 6-10, 12-15.

Marchese further actively undermined Plaintiffs' business interests and relationships. Compl. ¶ 159. He promoted Vikenco AS's merits as a supplier to Plaintiffs under apparent false pretenses, appears to have fabricated pricing data from other suppliers to favor Vikenco AS, and discouraged Plaintiffs' customers from purchasing certain products, all while positioning himself to later solicit these customers for Vikenco. *Id.* ¶¶ 160-65; Kennedy Decl., Ex. 18. Marchese also withheld from Plaintiffs business opportunities with other salmon producers that could have benefited Plaintiffs. Compl. ¶¶ 166-73; Kennedy Decl., Exs. 19-20. These actions had the effect of inducing BST into contracts with Vikenco AS that were competitively disadvantageous, and resulted in a windfall to Vikenco AS. Compl. ¶¶ 160, 173, 177. And Marchese was meeting with Vikenco personnel to, apparently, set up this business, including e-mailing about potential warehouse space and to discuss "VNA" (Vikenco North America). Kennedy Decl., Exs. 16-17.

Marchese resigned from BST in December 2024 and immediately assumed the role of CEO of Vikenco, which was incorporated in or about November 2024. Compl. ¶¶ 108, 115, 178, 181-82. Despite assurances to BST that Vikenco would not compete with Plaintiffs or solicit their

---

[3] Because of the sensitive nature of the identities of Plaintiffs' clients, the names have been anonymized here. Unredacted versions of the referenced e-mails will be provided to the Court under seal.

customers, Marchese and Vikenco promptly began soliciting and securing business from Plaintiffs' key customers. *Id.* ¶¶ 183-98. This was revealed when BST received two inadvertent emails from a major customer, Customer 2, which reflected purchase orders with Vikenco, and a third e-mail about a second customer; these e-mails had been intended for Marchese's Vikenco e-mail address, but were inadvertently sent to his old BST account. *Id.*; Kennedy Decl., Exs. 21-22.

## ARGUMENT

### I.    Legal Standard

Preliminary injunctive relief is appropriate when the movant demonstrates (1) a likelihood of success on the merits; (2) a significant risk of irreparable harm absent an injunction; (3) a favorable balance of hardships; and (4) a balance between the injunction and public interest. *See McGuire v. Reilly*, 260 F. 3d 36, 42 (1st Cir. 2001). "Likelihood of success is the touchstone of the preliminary injunction inquiry." *Philip Morris v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998). The Court need not conclusively determine the merits of the underlying claims with absolute assurance. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F. 3d 12, 15 (1st Cir. 2001).

### II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIMS

#### A.    Marchese and Vikenco Misappropriated Plaintiffs' Trade Secrets.

Marchese's and Vikenco's use of Plaintiffs' Confidential Information and solicitation of their customers constitutes misappropriation of trade secrets under federal and Massachusetts law.[4]

Claims for misappropriation of trade secrets under the federal Defense of Trade Secrets Act ("DTSA") and the Massachusetts Uniform Trade Secrets Act ("MUTSA") are nearly identical.

---

[4] Defendants are also likely to succeed on claims under the Massachusetts Unfair Trade Practice Act, M.G.L. c. 93A, §§ 2, *et. seq.* To state a claim, a "plaintiff must allege an unfair or deceptive act or practice that was committed by defendant in the conduct of any trade or commerce, and that the act or practice caused plaintiff to sustain injury." *Southwick Clothing LLC v. GFT (USA) Corp.*, 2004 U.S. Dist. LEXIS 25336, at *49 (S.D.N.Y. Dec. 13, 2004). As set forth herein, Defendants unfairly and deceptively misappropriated Plaintiffs' Confidential Information (*see* § III, *infra*) and further lied about Vikenco's status as a competitor (Compl. ¶ 184-186), which has harmed Plaintiffs.

*See KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 2021 WL 2982866, at *12 (D. Mass. July 15, 2021) ("DTSA and MUTSA are nearly equivalent."). To prevail, a plaintiff must show that: (1) "the information is a trade secret," (2) "the plaintiff took reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007).

Under the DTSA, the trade secret must be "used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). "MUTSA defines a 'trade secret' as any 'information that is not generally known or readily ascertainable to others who might obtain economic advantage from it, and that was the subject of reasonable efforts to protect against it being acquired, disclosed, or used without consent.'" *Netcracker Tech. Corp. v. Laliberte*, 2020 WL 6384312, at *3 (D. Mass. Oct. 30, 2020) (citations omitted). Customer lists are expressly defined as a trade secrets under MUTSA. *See* M.G.L. c. 93, § 42. Thus, when a company spends time, energy and money building a customer base whose identities are not readily ascertainable and are reasonably protected from disclosure, courts routinely enjoin the misappropriation of customer lists. *See, e.g.*, *FrontRunner HC, Inc. v. Waveland RCM, LLC*, 2020 WL 7321161, at *9 (D. Mass. Dec. 11, 2020); *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 239 (D. Mass. 2011).

Plaintiffs are likely to succeed under DTSA and MUTSA. Initially, the information misappropriated by Defendants – which includes customer lists, pricing and cost information, information regarding Plaintiffs' margins on certain sales, logistics information, and literal operational blueprints – constitutes trade secrets under the DTSA and MUTSA. *See* Compl., ¶¶ 2, 4, 7, 36, 40, 43, 117, 122-32, 135-53, 158; Kennedy Decl., Exs. 1-15. This information is not publicly available or readily ascertainable and it provides Plaintiffs with a competitive advantage;

absent these protections, Defendants or other competitors could readily undercut Plaintiffs' pricing, replicate its logistical and processing functions, and steal away customers with whom Plaintiffs have developed goodwill. *See* Compl. ¶¶ 124, 125, 127, 129, 132, 133, 140-41, 144, 148, 153, 158. Plaintiffs' business – buying, selling, and distributing seafood products across the globe and throughout the United States – inherently means that its trade secrets were used in, and intended for use in, both interstate and foreign commerce. *See* Compl. ¶¶ 24, 34, 43.

Second, Plaintiffs have taken reasonable steps to protect the secrecy of the Confidential Information. This includes, *inter alia*, requiring senior executives such as Marchese to sign restrictive covenant agreements protecting the Confidential Information, as well as additional post-employment covenants, and otherwise limiting access to this information. *See* Compl. ¶ 42.

Finally, Defendants used improper means to obtain this information. In the first instance, Marchese misused his position as a senior executive of BST to forward Confidential Information to Vikenco while still employed at BST. Compl. ¶¶ 2, 4, 7, 36, 40, 43, 117, 122-32, 135-53, 158; Kennedy Decl., Exs. 1-15. In so doing, he breached the confidentiality restrictions in the Restrictive Covenants, which prohibit disclosure or misuse of such information.

"[A]n individual who breaches a confidentiality agreement in accessing and appropriating trade secrets has used improper means." *Netcracker Tech. Corp. v. Laliberte*, 2020 WL 6384312, at *4 (D. Mass. Oct. 30, 2020). Both DTSA and MUTSA broadly define "improper means" to include the use of another's trade secret if the recipient knew or should have known that the information came from someone who had a duty to limit its use or disclosure. *See* M.G.L. c. 93 § 42; 18 U.S.C. § 1839(5). Vikenco plainly understood it was not entitled to the information it received from Marchese—there was no legitimate basis for Vikenco to receive Plaintiffs' customer information or its operational schematics or client information. *See* Compl. ¶¶ 213, 214.

### B. **Marchese Breached the Restrictive Covenants**

Marchese breached the Restrictive Covenants and thus is likely to be held liable for breach of contract. "Under Massachusetts law, to prove a breach of contract claim, a plaintiff must show: 1) existence of a valid and binding contract, 2) that the defendant breached the terms of the contract, and 3) the plaintiff has suffered damages from the breach." *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 127-28 (D. Mass. 2011) (citing *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1122 (1st Cir. 1995). The foregoing elements are satisfied.

#### *i. The Restrictive Covenants Are Valid and Binding Contracts*

The Restrictive Covenants are valid and binding agreements as they (1) are supported by consideration, (2) protect Plaintiffs' legitimate business interests, (3) contain reasonable time and geographical restraints, and (4) are consistent with the public interest. *Bowne, Inc. v. Levine*, 7 Mass. L. Rep. 685, 1997 Mass. Super. LEXIS 69, at \*5-6 (1997) (enforcing non-solicitation covenant); *see also Blackwell v. E.M. Helides, Jr., Inc.*, 368 Mass. 225, 228 (1975) (affirming enforceability of non-competition covenants); *All Stainless. Inc. v. Colby*, 364 Mass. 773, 778 (1974); *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 102-103 (1979).

***First***, the Restrictive Covenants are supported by consideration, which includes, *inter alia*, Marchese's continued employment with BST, the $200,000 Transaction Bonus, the Guaranteed Quarterly Bonus, his supplemental sales bonus, and Profit Interests. Compl. ¶¶ 48, 55, 65-66, 77-81, 92, Ex. A § 1, Ex. B, Ex. C §§ 2, 17, Ex. D §§ 1, 2, 3(e), 20. These agreements expressly affirm that the benefits were awarded in exchange for Marchese entering into the Restrictive Covenants, while Marchese acknowledged the adequacy, sufficiency and receipt of that consideration. *See id*. Such consideration is routinely deemed sufficient for similar employee restrictive covenants. *See, e.g.*, *BNY Mellon, N.A. v. Schauer*, 2010 WL 3326965, at \*7 (Mass. Super. May 14, 2010); *Marine Contractors Co. v. Hurley*, 365 Mass. 280, 285-86 (1974).

For non-competes, the Massachusetts Noncompetition Agreement Act ("MNAA"), M.G.L. c. 149 § 24L, also requires that such a covenant (but not a non-solicitation agreement or obligation to maintain confidential information) "be supported by fair and reasonable consideration independent from the continuation of employment . . . ." M.G.L. c. 149 § 24L(b)(ii). The Employment Agreement contains a non-compete supported by additional consideration in the form of (i) the Guaranteed Quarterly Bonus; (ii) his supplemental bonus of $0.10 per seafood burger sold; and (iii) a guaranteed term of employment for two years (other than termination for Cause). *See* Compl., Ex. C, § 2.[5] Likewise, the CRCA was provided in exchange for the Profits Interest and Marchese's admittance as a partner to Dory Holdings LLC. *See* Compl., Ex. D, § 2.

**Second,** Massachusetts courts recognize that protecting confidential information, trade secrets and customer goodwill is a legitimate business interest protectable by post-employment restrictions. *See Marine Contrs. Co.*, 365 Mass. at 287-288. Here, the Restrictive Covenants are narrowly tailored to protect such interests: they are aimed at (i) precluding improper use and dissemination of the Confidential Information, and (ii) preventing exploitation of goodwill developed by Plaintiffs. *Id.* ¶¶ 12, 42, 49, 57, 67. This information and these relationships were developed over significant time through the expenditure of substantial effort and cost by Plaintiffs, and allowing competitors like Defendants to exploit this information gives them an unfair competitive advantage, as they could reap the benefits of Plaintiffs' hard work, while undercutting them in the market. *Id.* ¶ 38, 40-41, 43, 44, 47, 105, 125, 132, 153, 158.

**Third,** the restrictions are reasonable. Massachusetts courts have recognized that indefinite, worldwide restrictions are reasonable to protect Confidential Information, such as that here. *See*

---

[5] The MNAA also requires that an employee be provided at least 10 days to review the agreement and the right to consult counsel. Marchese also acknowledged both were satisfied. Ex. C, § 17.

*SimpliVity Corp. v. Moran*, 2016 WL 5122671, at *12 (Mass. Super. Aug. 14, 2016) (affirming worldwide confidentiality protections); *Shipley Co. v. Kozlowski*, 926 F. Supp. 28, 29, 30 (D. Mass. 1996) (enforcing indefinite confidentiality protections). Likewise, the post-employment non-solicitation and non-competition covenants are limited to, respectively, two years and one year (subject to tolling for breach), which courts consistently find reasonable in duration. *SimpliVity*, 2016 WL 5122671, at *31-32 (one-year non-compete reasonable to prevent solicitation of clients and protect confidential information); *Aspect Software*, 787 F. Supp. 2d at 128 (upholding one-year non-compete); *All Stainless*, 364 Mass at 779 (two-year restriction reasonable).

 ***Finally***, "Massachusetts has a clear public policy in favor of strong protections for trade secrets." *Aspect Software,* 787 F. Supp. 2d at 131. Furthermore, "[i]t is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted." *Shipley*, 926 F. Supp. at 30. Restrictive covenants such as those here are routinely enforced in Massachusetts as consistent with public policy. *See, e.g., Aspect Software*, 787 F. Supp. 2d at 128 (upholding one-year non-compete); *All Stainless*, 364 Mass at 779 (two-year restriction reasonable).

### ii. The Other Elements for Breach of Contract Are Satisfied

 Plaintiffs additionally must show that Marchese "breached the terms of the [Restrictive Covenants]" and that they have "suffered damages from the breach." *Aspect Software, Inc.*, 787 F. Supp. 2d at 127-28.  These elements are readily satisfied here.

 First, Marchese breached the Restrictive Covenants. With respect to the covenants governing the protection of Confidential Information, Marchese has been caught red-handed funneling information from Plaintiffs to Vikenco to help it establish a competing business. Compl. ¶¶ 108-158; Kennedy Decl., Exs. 1-15. This plainly violates his obligations not to take and misuse Plaintiffs' Confidential Information. *Id.* ¶¶ 48-52, 58-60, 68, 86-89.

Second, Marchese breached the non-solicitation covenants. As reflected in the e-mails that were inadvertently sent to his old BST e-mail account, within the one-year non-solicitation period, he has been working soliciting and obtaining business from customers of Plaintiffs, with whom Marchese worked and was introduced during his employment with BST. Compl. ¶¶ 187-196; Kennedy Decl., Exs. 21-23. The non-solicitation covenants expressly prohibit him from doing this. *Id.* ¶¶ 53, 61, 70, 84-85. Accordingly, Marchese has breached these obligations.

Third, Marchese has violated the non-competition covenants in the Employment Agreement and the CRCA. These covenants expressly prohibit providing services to a competitive entity for a one-year period post-employment. Compl. ¶¶ 70-73, 82-84, Ex. C § 7, Ex. D § 3. This notwithstanding, Marchese joined Vikenco and is clearly engaging in competitive activity: he is stealing Plaintiffs' customers and has stolen their Confidential Information to build out Vikenco's competing business. *Id.* ¶¶ 115-201. This is in direct violation of these covenants.

With respect to damages, Plaintiffs have suffered and are continuing to suffer irreparable harm (*see* § III, *infra*), in addition to potential lost revenue and profits through the loss of clients and/or diminished business with clients by virtue of Defendants' conduct. Compl. ¶¶ 159-172, 221-233. In addition, Plaintiffs have suffered harm through Marchese's provision of Confidential Information to Vikenco AS during his employment, which allowed Vikenco AS to manipulate pricing in a manner unfavorable to Plaintiffs. *Id.* ¶¶ 115-158.

## III.   PLAINTIFFS HAVE SUFFERED AND WILL SUFFER IRREPARABLE HARM

Plaintiffs have suffered and will continue to suffer irreparable harm absent injunctive relief.

> As a general rule, a breach of non-compete agreements tied to trade secrets concerns triggers a finding of irreparable harm. . . . [A plaintiff's] successful showing that it is likely to prevail on claim that [the defendant] violated the Agreement's non-compete clause designed to protect trade secrets would be sufficient to establish a significant risk of irreparable harm.

*Aspect Software*, 787 F. Supp. 2d at 130 (citing *Lombard Med. Techs., Inc. v. Johannessen*, 729 F. Supp. 2d. 432, 442 (D. Mass. 2010)); *see also Frequency Thera., Inc. v. Weber,* 2018 WL 6933369, at *3 (Mass. Super. Nov. 28, 2018).

Here, that "general rule" has been satisfied. More to the point, Marchese's breach of the Restrictive Covenants has injured and diminished, and will continue to injure and diminish, Plaintiffs' existing and future business, their goodwill and relationships with customers and other business partners, as well as their competitive edge in the marketplace. Compl. ¶¶ 115-201, 221-33. Indeed, Marchese's conduct could serve to seriously undermine BST's ability to operate, as the misappropriated information relates to many of BST's largest customers, which accounted for over $150 million in sales in just 2024 alone. *Id.* ¶ 134. Precedent squarely recognizes that irreparable harm will result from breaches such as those at issue here.

Finally, Marchese has acknowledged his breach of the Restrictive Covenants will cause irreparable harm. Compl. ¶¶ 54, 63, 75-76, 82, 87, 89.  Indeed, Plaintiffs "need not demonstrate irreparable harm," as Marchese acknowledged in the Restrictive Covenants "that a remedy at law would be inadequate." *See Tuckerbrook Alternative Invs., LP v. Banerjee*, 2008 WL 2356349, at *4 (D. Mass. June 4, 2008); *see* Compl. ¶¶ 54, 63, 75-76, 82, 87, 89.

## IV.    **THE BALANCE OF HARM FAVORS PLAINTIFFS**

The balance of harms favors injunctive relief. With respect to Marchese, Massachusetts law supports that while restrictive covenants "by their nature impose some burden on former employees," this "fact alone does not make such covenants unenforceable." *Lombard Med. Techs.*, 729 F. Supp. 2d at 442 (quoting *Marine Contractors Co., Inc.*, 365 Mass., at 289). Here, Marchese affirmatively acknowledged that abiding by the Restrictive Covenants will not cause undue hardship or unreasonably interfere with his ability to earn a livelihood. *See* Compl. Ex. A, § 5(d), Ex. B, § III(vi), Ex.  D, § 3(e). More to the point, Marchese is not prohibited from working; rather,

he is simply (i) prohibited from using the Confidential Information; (ii) prohibited for one year from soliciting Plaintiffs' customers; and (iii) prohibited from providing competitive services for one year. Compl. Ex. A § 5, Ex. B § III, Ex. C §§ 5, 7, Ex. D §§ 3, 4. This is narrow and causes no meaningful harm to Marchese, particularly given the substantial sums paid to him by Plaintiffs over the years. Compl. ¶¶ 101-02.

As to Vikenco, injunctive relief is warranted as such will simply place them where they would be absent the violations of law at issue here. Vikenco should not be permitted to benefit from Plaintiffs' Confidential Information and their exploitation of Plaintiffs' goodwill, or the fruits of same. In short, injunctive relief here will serve only to place Vikenco in the position that it would have been absent the malfeasance at issue here.

## V.    PUBLIC POLICY FAVORS PLAINTIFFS

As noted previously, "Massachusetts has a clear public policy in favor of strong protections for trade secrets." *Aspect Software, Inc.*, 787 F. Supp. 2d at 131. "'It is the policy of the law, for the advantage of the public, to encourage and protect invention and commercial enterprise.' This encouragement and protection is afforded trade secrets because the public has a manifest interest not only in commercial innovation and development, but also in '[t]he maintenance of standards of commercial ethics.'" *Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 167 (1979) (citing *Kewanee Oil Co.* v. *Bicron Corp.*, 416 U.S. 470, 481 (1974)).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court enter a temporary restraining order and preliminary injunction, pursuant to Fed. R. Civ. P. 65, enforcing Marchese's Restrictive Covenants and restraining Defendants from using Plaintiffs' confidential information and trade secrets, as set forth in the Proposed Order submitted herewith.

Dated: Boston, Massachusetts
        April 28, 2025

Respectfully submitted,

BOSTON SWORD & TUNA, LLC and
FORTUNE INTERNATIONAL, LLC,

By its attorneys,

_/s/      Bruce Barnett_
Bruce Barnett, Esq. (BBO #647666)
DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, Massachusetts 02110
Tel.: (617) 406-6000
bruce.barnett@us.dlapiper.com

Garrett Kennedy, Esq.*
DLA Piper LLP (US)
1251 Avenue of the Americas
27th Floor
New York, NY 10020-1104
Tel: 212-335-4500
garrett.kennedy@us.dlapiper.com

* Application for admission pro hac vice pending

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 29, 2025.  I further certify that this document was emailed to the defendants on April 28, 2025.

*/s/ Bruce Barnett*
Bruce Barnett